**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

| | |
|---|---|
| **STATE OF WEST VIRGINIA**;<br>**STATE OF NORTH DAKOTA**;<br>**STATE OF GEORGIA**;<br>**STATE OF IOWA**;<br>**STATE OF ALABAMA**;<br>**STATE OF ALASKA**;<br>**STATE OF ARKANSAS**;<br>**STATE OF FLORIDA**;<br>**STATE OF INDIANA**;<br>**STATE OF KANSAS**;<br>**STATE OF LOUISIANA**;<br>**STATE OF MISSISSIPPI**;<br>**STATE OF MISSOURI**;<br>**STATE OF MONTANA**;<br>**STATE OF NEBRASKA**;<br>**STATE OF NEW HAMPSHIRE;**<br>**STATE OF OHIO**;<br>**STATE OF OKLAHOMA;**<br>**STATE OF SOUTH CAROLINA**;<br>**STATE OF SOUTH DAKOTA;**<br>**STATE OF TENNESSEE;**<br>**STATE OF UTAH;**<br>**COMMONWEALTH OF VIRGINIA;**<br>**STATE OF WYOMING**; | |
| Plaintiffs, | Case No. _____ <br><br> Hon. _____ |
| v. | |
| **U.S. ENVIRONMENTAL**<br>**PROTECTION AGENCY**;<br>**MICHAEL S. REGAN**, in his official<br>capacity as Administrator of the U.S.<br>Environmental Protection Agency;<br>**U.S. ARMY CORPS OF ENGINEERS**;<br>**MICHAEL L. CONNOR**, in his official<br>capacity as Assistant Secretary of the<br>Army for Civil Works; **LTG SCOTT A.**<br>**SPELLMON**, in his official capacity as<br>Chief of Engineers and Commanding<br>General, U.S. Army Corps of Engineers, | |
| Defendants. | |

## COMPLAINT

Plaintiff States of West Virginia, North Dakota, Georgia, Iowa, Alabama, Alaska, Arkansas, Florida, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, and Wyoming, and the Commonwealth of Virginia, for their Complaint, allege as follows:

### INTRODUCTION

1.       All States—including the 24 States here—have a sovereign interest in managing, protecting, and caring for their land and water resources.  In fact, when Congress passed the Clean Water Act (CWA) in 1972, it simultaneously sought to "recognize, preserve, and protect the *primary* responsibilities and rights of States" as to pollution mitigation and "the development and use … of land and water resources."  33 U.S.C. § 1251(b) (emphasis added).

2.       For good reason, then, courts have recognized the waters within a State's borders are that "State's legitimate legislative business."  *S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 386 (2006).

3.       Even so, two federal agencies—the Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (the Corps) (together, the Agencies)—seem intent on pushing the States aside and seizing control over the nation's water management.

4.       Most recently, the Agencies have sought to expand their own authority by broadly defining "waters of the United States," a key jurisdictional provision in the CWA.  33 U.S.C. § 1362(7).  Colloquially known as WOTUS, the phrase "waters of the United States" is used to define the scope of "navigable waters," *id.*, which in turn prescribes the Agencies' jurisdictional reach under the Act.  If "WOTUS" is defined more broadly, then more waters and lands are subject

to rigorous federal permitting requirements, potential criminal penalties for discharges, and much more.

5.     This suit concerns the Agencies' most recent effort to reinterpret WOTUS in an unlawfully aggressive way.  That effort began when the Agencies published a Proposed Rule with a "Revised Definition" of WOTUS near the end of 2021.  *See* 86 Fed. Reg. 69372 (Dec. 7, 2021). It ended when they published a Final Rule broadening that definition just a few weeks ago.  *See* 88 Fed. Reg. 3004 (Jan. 18, 2023) (Ex. A).  The Agencies rushed to issue the Final Rule even though the Supreme Court is expected to issue a key decision on the scope of WOTUS in the coming months.  *See Sackett v. EPA*, 8 F.4th 1075 (9th Cir. 2021), *cert. granted*, 142 S. Ct. 896 (2022).

6.     The Final Rule is riddled with problems.  As the States further explain below, the Final Rule violates the CWA, 33 U.S.C. §§ 1251-1387, the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, and the United States Constitution.  It "exce[eds] [the Agencies'] statutory jurisdiction [and] authority" under the CWA by encompassing waters with no reasonable connection to "navigable waters."  *See* 5 U.S.C. § 706(2)(C).  It is arbitrary and capricious because—among many things—it embraces vague standards with little justification and minimal consideration of costs.  *See* 5 U.S.C. § 706(2)(A).  The Agencies promulgated the Final Rule in violation of multiple procedural obligations.  *See* 5 U.S.C. § 706(2)(D).  And the Final Rule runs "contrary to constitutional right, power, privilege, or immunity," by offending the Commerce Clause, Due Process Clause, and the Tenth Amendment of the U.S. Constitution.  *See* 5 U.S.C. § 706(2)(B).

7.     The Final Rule's serious problems produce equally serious harms for States and their residents.

8.     By implementing an overbroad and hopelessly vague scheme, the Agencies have toppled the cooperative federalism regime that Congress intended to protect in the CWA.  Core state sovereign interests can be subjugated to the desires of two federal administrative agencies, even as to remote, non-navigable, intermittent, ephemeral, and purely intrastate waters.  At the same time, States will be saddled with substantial compliance costs of their own.  Yet the Agencies have concluded that the Final Rule does not have federalism implications at all.  88 Fed. Reg. at 3141.

9.     Meanwhile, if the Final Rule is left in place, then ranchers, farmers, miners, homebuilders, and other landowners across the country will struggle to undertake even the simplest of activities on their own property without fear of drawing the ire of the federal government.  Landowning Americans of all stripes will thus be left with a choice: (a) fight their way through an expensive and lengthy administrative process to obtain complex jurisdictional determinations and permits or (b) face substantial civil and criminal penalties.  The Final Rule's ambiguous environmental benefits do not justify any of this.

10.     Not so long ago, this Court stepped in to enjoin a similar effort to reinterpret WOTUS in an unlawful way.  *See North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015) (preliminarily enjoining the 2015 WOTUS rule after finding that it likely violated the CWA's grant of authority to the Agencies, was arbitrary and capricious because it offered tests not supported by evidence, and violated procedural requirements because it was not a "logical outgrowth" of the proposed rule).

11.     The States now ask this Court to intervene to stop an improper federal power grab over state waters once more.  The States respectfully request that the Court enter a declaratory judgment that the Final Rule is unlawful and vacate it.  They further request that the Court enjoin

Defendants from enforcing the Final Rule within the Plaintiff States.  Only then can the States reassume their "primary" authority over these important waters, 33 U.S.C. § 1251(b), and Americans can resume enjoyment of their property unencumbered by this overbroad rule.

## JURISDICTION AND VENUE

12.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. §§ 701-706, and the Constitution and laws of the United States.  The Court may grant declaratory and injunctive relief under the APA, 5 U.S.C. §§ 705-706, as well as under 28 U.S.C. §§ 2201-2202 and Federal Rules of Civil Procedure 57 and 65.

13.     This suit is not a challenge to any of the "seven categories of EPA actions for which review lies directly and exclusively in the federal courts of appeals."  *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 623 (2018) (citing 33 U.S.C. § 1369(b)(1)).

14.     Venue is proper under 28 U.S.C. § 1391(e) because Plaintiff State of North Dakota resides in this district and Defendants are agencies of the United States or officers thereof acting in their official capacity.  Further, the Agencies will make jurisdictional determinations under the Final Rule within this district.  *See id.* § 1391(e)(1)(B).

## PARTIES

15.     Plaintiff States are sovereign entities that regulate land use, water quality, and water resources within their borders through duly enacted state laws administered by state officials and constituent agencies.  Plaintiff States also directly administer certain provisions of the CWA, *see* 33 U.S.C. §§ 1251-1387, and each (with the exception of New Hampshire) has been delegated authority to implement additional programs under 33 U.S.C. § 1342(b).

16.     Defendant EPA is an agency of the United States within the meaning of the APA. *See* 5 U.S.C. § 551(1).  Defendant Michael S. Regan is Administrator of EPA and named as a party

in his official capacity.  EPA and its Administrator are charged with administering many provisions of the CWA on behalf of the federal government.  *See* 33 U.S.C. §§ 1251-1387.

17.     Defendant Corps is an agency of the United States within the meaning of the APA. *See* 5 U.S.C. § 551(1).  Defendant Michael L. Connor is the Assistant Secretary of the Army for Civil Works and named as a party in his official capacity.  Defendant Lieutenant General (LTG) Scott A. Spellmon is the Chief of Engineers and Commanding General for the Corps and named as a party in his official capacity.  The Corps, the Secretary of the Army for Civil Works, and the Chief of Engineers and Commanding General of the Corps are charged with administering many provisions of the CWA on behalf of the federal government.  *See* 33 U.S.C. §§ 1251-1387.

## STANDING

18.     The Plaintiff States have standing to challenge the Final Rule and to seek injunctive and declaratory relief.

19.     The Final Rule subjects the Plaintiff States to many different injuries, each of which is "concrete and particularized," "actual or imminent," "fairly traceable" to the Final Rule, and "likely" to be "redressed by a favorable decision" from this Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up).

20.     *First*, the Final Rule offends the Plaintiff States' traditional "power to control navigation, fishing, and other public uses of water," which "is an essential attribute of [their] sovereignty." *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 631 (2013) (cleaned up); *see also Kansas v. Nebraska*, 574 U.S. 445, 480 (2015) (Thomas, J., concurring in part) ("Authority over water is a core attribute of state sovereignty.").  Plaintiff States' rights over rivers and other intrastate waters are "obvious, indisputable," and "omnipresent." *Hudson Cnty. Water Co. v. McCarter*, 209 U.S. 349, 356 (1908).

21.     Congress has honored this sovereign prerogative, too.  It has shown "purposeful and continued deference to state water law," *California v. United States*, 438 U.S. 645, 653 (1978), including an "almost invariabl[e] defer[ence] to" it when addressing "whether federal entities must abide by" it, *United States v. New Mexico*, 438 U.S. 696, 702 (1978).  When possible, Congress has also confirmed its "policy … to recognize the interests and rights of the States in determining the development of the watersheds within their borders and likewise their interests and rights in water utilization and control."  33 U.S.C. § 701-1; *see also Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 959 (1982) (describing "37 statutes and the interstate compacts [that] demonstrate Congress' deference to state water law").

22.     The CWA itself recognizes the primacy of the States' interests.  When Congress created new federal mechanisms to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), it simultaneously "recognize[d], preserve[d], and protect[ed] the *primary* responsibilities and rights of States" when it comes to pollution mitigation and "the development and use … of land and water resources," *id.* § 1251(b) (emphasis added).

23.     This commitment manifests as a robust program of "cooperative federalism," *New York v. United States*, 505 U.S. 144, 167 (1992), or a deep partnership between "the States and the Federal Government," *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992).

24.     The Final Rule destroys this partnership, empowering the Agencies to subject lands and waters within the States to federal jurisdiction based on subjective and ill-defined criteria that place no meaningful boundaries on the Agencies' discretion to assert jurisdiction.

25.     By expanding the definition of WOTUS, the Final Rule will harm the States in their capacity as owners and regulators of the waters and lands of their States.

26.     West Virginia law, for example, provides that "[t]he waters of the State of West Virginia are claimed as valuable public natural resources held by the state for the use and benefit of its citizens." W. VA. CODE § 22-26-3.  Consistent with this mandate, West Virginia holds many waters and lands.  It also has a statutory duty to "manage and protect its waters effectively for present and future use and enjoyment and for the protection of the environment." *Id.*  The State has carried out this statutory duty diligently, enacting numerous laws to protect the State's waters, both on public and on private lands.  *See generally Id.* §§ 22-11-1 to -15.

27.     In North Dakota, "[a]ll flowing streams and natural watercourses shall forever remain the property of the state for mining, irrigating and manufacturing purposes." N.D. CONST. art. XI, § 3; *see* N.D. CENT. CODE § 61-01-01 (surface and ground waters "belong to the public and are subject to appropriation for beneficial use").  It is the State's policy to "act in the public interest to protect, maintain, and improve the quality of the waters in the state for continued use as public and private water supplies, propagation of wildlife, fish and aquatic life, and for domestic, agricultural, industrial, recreational, and other legitimate beneficial uses." N.D. CENT. CODE § 61-28-01.  To implement this policy, the State has enacted numerous laws protecting its waters.  *See generally* N.D. CENT. CODE ch. 61-28 and N.D. ADMIN. CODE art. 33.1-16.

28.     Under Georgia law, "[t]he people of the State of Georgia are dependent upon the rivers, streams, lakes, and subsurface waters of the state for public and private water supply and for agricultural, industrial, and recreational uses." GA. CODE ANN. § 12-5-21(a).  The law goes on to declare as state policy that "the water resources of the state shall be utilized prudently for the maximum benefit of the people, in order to restore and maintain a reasonable degree of purity in the waters of the state and an adequate supply of such waters, and to require where necessary

reasonable usage of the waters of the state." *Id.*  In connection with these statutes, the State has enacted a range of laws regulating the State's waters. *See generally id.* § 12-5-20, *et seq*.

29.     The situation is similar in Iowa.  Iowa law explains that "the citizens of Iowa have built and sustained their society on Iowa's air, soils, waters, and rich diversity of life." Iowa Code § 455A.15.  The state broadly defines "water of the state" to include any "stream, lake, pond, marsh, watercourse, waterway, well, spring, reservoir, aquifer, irrigation system, drainage system, and any other body or accumulation of water." *Id.* § 455B.171(41).  Those waters are the "public wealth of the state and subject to use in accordance" with state law. *Id.* § 455B.1262.  To that end, "the control and development and use of water for all beneficial purposes is vested in the state." *Id.*  Indeed, every water of the state is regulated.  In accord, the State has enacted a range of statutes regulating the use of the State's waters. *See generally id.* §§ 455.1, *et seq.*  The new WOTUS rule puts those State policies at risk, as estimates from the similar 2015 rule placed under EPA's jurisdiction almost 97% of Iowa's land. *See* Scott Van Aartsen, *Injunction Halts Enforcement of WOTUS in Iowa*, 12 Other States, KIWARADIO, https://perma.cc/ZCZ2-JAE8 (Sept. 19, 2018).

30.     The Alabama Legislature has recognized that "[p]roper management of the watersheds of the state is necessary to insure the health, safety and welfare of our citizens." Ala. Code § 9-10A-1.  The State has enacted laws "for the purpose of developing and executing plans and programs relating to any phase of conservation of water, water usage, flood prevention, flood control, water pollution control, wildlife habitat protection, agricultural and timberland protection, erosion prevention and control of erosion, flood-water and sediment damages." *Id.* § 9-10A-3. And the State has enacted the Alabama Water Pollution Control Act "to conserve the waters of the state and to protect, maintain and improve the quality thereof for public water supplies, for the propagation of wildlife, fish and aquatic life and for domestic, agricultural, industrial, recreational

and other legitimate beneficial uses; to provide for the prevention, abatement and control of new

or existing water pollution; and to cooperate with other agencies of the state, agencies of other

states and the federal government in carrying out these objectives." *Id.* § 22-22-2.

31.     In Alaska, the State owns the natural resources within its navigable waters and it

holds the "right and power to manage, administer, lease, develop, and use [submerged] lands and

natural resources all in accordance with applicable State law."  Submerged Lands Act of 1953, 43

U.S.C. § 1311(a), incorporated by reference in, Alaska Statehood Act, Pub. L. No. 85-508, § 6(m),

72 Stat. 339 (1958).  The State holds surface and groundwaters for the people for their common

use, subject to appropriation, beneficial use, and reservation under State law.  Alaska Const. Art.

VIII, §§ 3, 13; Alaska Stat. § 46.15.030.  Alaska is home to a staggering quantity and diversity of

waters, with over three million lakes, more than 900,000 navigable rivers and streams, and more

than 63 percent—174 million acres—of the Nation's wetlands.  Indeed, in *Rapanos v. United

States*, the Supreme Court's plurality recognized that the Agencies' "immense expansion of federal

regulation of land use" within "swampy lands" extended to over "half of Alaska."  547 U.S. 715,

722 (2006) (plurality op.).  The Agencies' most recent interpretation has again cast regulatory

uncertainty over much of Alaska's lands and waters, including within unique features such as its

vast permafrost regions and forested wetlands.  Additionally, it exposes much of these areas to

EPA's power under CWA § 404(c) to prohibit, deny, or restrict the specification of WOTUS for

disposal sites for discharges of dredged or fill material.  33 U.S.C. § 1344.  EPA recently exercised

its CWA § 404(c) power over 309 square miles of primarily State-owned land in Alaska.  *See* Final

Determination to Prohibit the Specification of and Restrict the Use for Specification of Certain

Waters Within Defined Areas as Disposal Sites; Pebble Deposit Area, Southwest Alaska, 88 Fed.

Reg. 7441, 7443 (Feb. 3, 2023).

32.     Plaintiff State of Arkansas is a sovereign state of the United States of America. Arkansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its state waters "for wildlife habitat, recreation, industry, agriculture, and commerce."  ARK. CODE ANN. § 15-22-201(c)(1).  Indeed, Arkansas law has long recognized "the vital importance of water to the prosperity and health of both people and their natural surroundings" and the need to properly manage Arkansas's water resources to ensure Arkansas continues "to be known both as a natural state and a land of opportunity where agriculture, industry, tourism, and recreation will remain strong for future generations."  *Id.* § 15-22-201(a)-(b).  Arkansas brings this suit through its Attorney General, Tim Griffin.  He is the chief legal officer of the State of Arkansas and has the authority to represent the State in federal court.  *See id.* § 25-16-703(a).

33.     Under the Florida Constitution, it is "the policy of the state to conserve and protect its natural resources and scenic beauty."  Fla. Const. art. II, § 7.  Florida law recognizes that "water constitutes a public resource benefiting the entire state."  § 373.016, Fla. Stat.  In connection with these policies, Florida has enacted a variety of laws regulating the State's waters including protection and regulation of the Everglades, one of the largest wetlands in the United States.  *See, e.g.*, § 373.4592, Fla. Stat. (Everglades improvement and management); § 373.013 et seq. (Florida Water Resources Act of 1972).

34.     In Indiana, "natural stream[s], natural lake[s]," and other "natural bod[ies] of water ... that may be applied to a useful and beneficial purpose" are "natural resource[s] and public water of Indiana."  IND. CODE § 14-25-1-2(a); *see id.* §§ 14-26-2-5(c)-(d), 14-26-2.1-3.  Indiana holds and manages those waters "for the public welfare."  *Id.* § 14-25-1-2(a)(2); *see, e.g.*, *id.* § 14-25-1-1, *et seq.*; *id.* § 14-26-1-1, *et seq.*; *id.* § 14-27-1-1, *et seq.*; *id.* § 14-29-1-1, *et seq.*

Additionally, Indiana seeks to "preserve, protect, and enhance" other waters through a variety of regulatory programs. *Id.* § 13-12-3-1; *see, e.g.*, *id.* § 13-18-2-1, *et seq.*; 327 IND. ADMIN. CODE § 1-1-1, *et seq.* Waters subject to regulation generally include "accumulations," and any "part of the accumulations," of "water, surface and underground, natural and artificial, public and private, ... that are wholly or partially within, flow through, or border upon Indiana." IND. CODE § 13-11-2-265(a).

35.     Kansas has "dedicated" "[*a*]*ll* water within the [S]tate . . . to the use of the people of the [S]tate" and has subjected its waters "to . . . [State] control and regulation." Kan. Stat. Ann. § 82a-702 (emphasis added). Correspondingly, Kansas has enacted numerous laws to regulate its waters. *See, e.g.*, KAN. STAT. ANN. § 2-1908; §§ 74-2606 to -2623; §§ 82a-101 to -2420. Such laws were enacted to effectuate State legislative policies including that of providing "for the conservation, use and development of the soil and water resources of th[e] [S]tate[.]" *Id.* § 2-1902(D). The purpose of that policy, and others related to it, is "to preserve natural resources, control floods, prevent impairment of dams and reservoirs, assist in maintaining the navigability of rivers and harbors, preserve wild life, protect the tax base, protect public lands, and protect and promote the health, safety, and general welfare of the people of this state." *Id.*

36.     The Louisiana Constitution provides that "[t]he natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people," and "[t]he legislature shall enact laws to implement this policy." LA CONST. Art. IX Sec. 1. Further, "[t]he legislature shall neither alienate nor authorize the alienation of the bed of a navigable water body, except for purposes of reclamation by the riparian owner to recover land lost through erosion," although the State may lease state "water bottoms for

mineral or other purposes." LA. CONST. Art. IX Sec. 3. Consistent with these provisions, the Louisiana legislature has enacted numerous laws governing its land and waters and providing for the orderly development of Louisiana's natural resources.

37.     In Mississippi, "[a]ll water, whether occurring on the surface of the ground or underneath the surface of the ground, is … among the basic resources of [the] state," "belong[s] to the people of [the] state," and "is subject to regulation" by the State government.  MISS. CODE. ANN. § 51-3-1.  "The control and development and use of water for all beneficial purposes shall be in the state, which, in the exercise of its police powers, shall take such measures to effectively and efficiently manage, protect and utilize the water resources of Mississippi."  *Id.*; *see also id.* ("[T]he general welfare of the people of the State of Mississippi requires that the water resources of the state be put to beneficial use to the fullest extent of which they are capable.").  To carry out this responsibility, Mississippi has enacted numerous laws governing the State's waters and water resources.  *See, e.g., id.* tit. 51.

38.     Under Missouri law, it is "the public policy of this state to conserve the waters of the state and to protect, maintain, and improve the quality thereof for public water supplies and for domestic, agricultural, industrial, recreational and other legitimate beneficial uses and for the propagation of wildlife, fish and aquatic life."  MO. REV. STAT. § 644.011 (2015).  Missouri law holds that "the pollution of the waters of this state constitutes a menace to public health and welfare" and seeks to achieve clean water goals "while maintaining maximum employment and full industrial development of the state."  *Id.*  The waters of the state are broadly defined as "all waters within the jurisdiction of this state, including all rivers, streams, lakes and other bodies of surface and subsurface water lying within or forming a part of the boundaries of the state which are not entirely confined and located completely" on private land.  *Id.* § 644.016.  Missouri has

enacted a comprehensive statutory scheme to regulate its waters.  *See generally id.* § 644.006, *et seq.*; see also 10 CSR 20-7.010-7.050.

39.     The Montana Constitution charges the state to "maintain and improve a clean and healthful environment in Montana for present and future generations."  Mont. Const. art. IX, §1(1). To that end, Montana comprehensively regulates water quality through the Montana Water Quality Act.  *See generally* Mont. Code. Ann. § 75-5-101, et seq.  It is, therefore, "the public policy" of Montana to "(1) conserve water by protecting, maintaining, and improving the quality and potability of water for public water supplies, wildlife, fish and aquatic life, agriculture, industry, recreation, and other beneficial uses; (2)    provide a comprehensive program for the prevention, abatement, and control of water pollution; and; (3)    balance the inalienable rights to pursue life's basic necessities and possess and use property in lawful ways with the policy of preventing, abating, and controlling water pollution."  Mont. Code. Ann. §. 75-5-101(1)-(3).  Montana broadly defines "state waters" as "a body of water, irrigation system, or drainage system, either surface or underground."  Mont. Code. Ann. § 75-5-103(32)(a).  The new WOTUS rule puts those policies at risk, as estimates from the similar 2015 rule placed under EPA's jurisdiction nearly 90% of Montana's land.  *See* John Youngberg, *It's Baaack: WOTUS and the Government Land Grab*, MONTANA FARM BUREAU FEDERATION (July 23, 2021), https://mfbf.org/Article/Its-baaack-WOTUS-and-the-government-land-grab.

40.     In Nebraska, "ownership of water is held by the state for the benefit of its citizens," NEB. REV. STAT. § 46-702, and "[t]he use of the water of every natural stream within the State of Nebraska is hereby dedicated to the people of the state for beneficial purposes," NEB. CONST. art. XV, § 5.  The state defines its waters broadly to include "all waters within the jurisdiction of the state, including all streams, lakes, ponds, impounding reservoirs, marshes, wetlands, watercourses,

waterways, wells, springs, irrigation systems, drainage systems, and all other bodies or accumulations of water, surface or underground, natural or artificial, public or private, situated wholly or partly within or bordering upon the state." NEB. REV. STAT. § 81-1502(21). Using that definition, Nebraska has enacted robust environmental statutes to protect the purity and integrity of its waters, including but not limited to the Nebraska Environmental Protection Act and the Livestock Waste Management Act. *See* NEB. REV. STAT. § 81-1501 *et seq.* (declaring in Neb. Rev. Stat. § 81-1501 that "the water, land, and air of this state are among its most precious resources and the pollution thereof becomes a menace to the health and welfare of each person, and the public in general, in this state" and "pollution of these resources in this state is likewise a concern in adjoining states."); *id.* § 54-2416 *et seq.*

41.     New Hampshire law provides that New Hampshire's "lakes," "rivers and streams" are among its "most important natural resources," vital to "commerce, industry . . . tourism," "recreation" and "the quality of life of New Hampshire people," and, as such it is the policy of the state of New Hampshire "to ensure the continued viability of New Hampshire rivers as valued ecologic, economic, public health and safety, and social assets for the benefit of present and future generations" and to "insure the continued vitality of New Hampshire lakes as key biological, social, and economic assets, while providing that public health is ensured for the benefit of present and future generations."   N.H. REVISED STATUTES ANNOTATED § 483:1 and 483-A:1     New Hampshire has enacted multiple statutes and promulgated numerous administrative regulations to "prevent pollution in the surface and groundwaters of the state," to "maintain the integrity of public waters," and to "protect and preserve its submerged lands … and its wetlands." *See generally* N.H. REVISED STATUTES ANNOTATED §§ 481 - 489-C and Env-Wq 300, et seq.

42.     Ohio claims as "waters of the state" "all streams, lakes, ponds, marshes, watercourses, waterways, wells, springs, irrigation systems, drainage systems, and other bodies or accumulations of water, surface and underground, natural or artificial, that are situated wholly or partly within, or border upon, this state or are within its jurisdiction, except those private waters that do not combine or effect a junction with natural surface or underground waters." OHIO REV. CODE § 6121.01(D); *see also id.* §§ 939.01(L); 1521.01(E); 6111.01(H); 6112.01(H); 6119.011(E). It is Ohio public policy "[t]o preserve, protect, upgrade, conserve, develop, utilize, and manage the water resources of the state; … [t]o prevent or abate the pollution of water resources; [and] [t]o promote the beneficial use of waters of the state for the protection and preservation of the public health, safety, convenience, and welfare[.]" *Id.* § 6121.03(A)(1)-(3).   Ohio empowers state agencies to regulate the range of state interests from water pollution, *id.* § 6111.03, to conservation, *id.* § 939.02, and drainage, *id.* § 1521.03.

43.     Under Oklahoma law, waters of the state broadly include "all streams, lakes, ponds, marshes, watercourses, waterways, wells, springs, irrigation systems, drainage systems, storm sewers and all other bodies or accumulations of water, surface and underground, natural or artificial, public or private, which are contained within, flow through, or border upon this state or any portion thereof, and shall include under all circumstances the waters of the United States which are contained within the boundaries of, flow through or border upon this state or any portion thereof." OKLA. STAT. tit. 27A, § 1-1-201(20) (defining "waters of the state" under the Oklahoma Environmental Quality Act); *see also* OKLA. STAT. tit. 82, § 1084.2(3) (defining "waters of the state" under Oklahoma Statutes Title 82, Waters and Water Rights).   Furthermore, Oklahoma has declared it to be "the public policy of this state to conserve the waters of the state and to protect, maintain and improve the quality thereof for public water supplies, for the propagation of wildlife,

fish and aquatic life and for domestic, agricultural, industrial, recreational and other legitimate beneficial uses ... ." OKLA. STAT. tit. 27A, § 2-6-102; *see also* OKLA. STAT. tit. 82, § 1084.1. Accordingly, Oklahoma has enacted numerous laws to regulate the State's waters. *See generally*, OKLA. STAT. tit. 27A, §§ 2-6-101 *et seq.*; OKLA. STAT. tit. 82, §§ 1020.1 *et seq.*; OKLA. STAT. tit. 82, §§ 1084.1 *et seq.*

44.     South Carolina has numerous laws to protect its waters.  For example, South Carolina's Pollution Control Act, provides that it is "the public policy of the State [is] to maintain reasonable standards of purity of the air and water resources of the State, consistent with the public health, safety and welfare of its citizens ... [and] the protection of terrestrial and marine flora and fauna ... .  [T]he Department of Health and Environmental Control shall have authority to abate, control and prevent pollution."  S.C. CODE ANN. § 48-1-20.  South Carolina law further provides that "[a] person who discharges organic or inorganic matter into the waters of this State ... to the extent that the fish, shellfish, aquatic animals, wildlife, or plant life indigenous to or dependent upon the receiving waters or property is damaged or destroyed is liable to the State for the damages. *Id.* § 48-1-90.  "A person affected by the provisions of this chapter or the rules and regulations adopted by the department desiring to ... discharge ... sewage, industrial waste or other wastes, or the effluent therefrom, or air contaminants, into the waters or ambient air of the State, first shall make an application to the department for a permit to construct and a permit to discharge from the outlet or source."  *Id.* § 48-1-100.  The importance of South Carolina waters to the State is further demonstrated by its Constitution which provides that "[a]ll navigable waters shall forever remain public highways free to the citizens of the State ..."  S.C. CONST. art. XIV, §4.  Similarly, S.C. Code Ann. §49-1-10 states that "all navigable watercourses and cuts are hereby declared navigable

streams and such streams shall be common highways and forever free, as well to the inhabitants of this State."

45.     In South Dakota, "the people of the state have a paramount interest in the use of all the water of the state and that the state shall determine what water of the state, surface and underground, can be converted to public use or controlled for public protection."  SDCL § 46-1-1.  Under South Dakota law, "the protection of the public interest in the development of the water resources of the state is of vital concern to the people of the state and that the state shall determine in what way the water of the state, both surface and underground, should be developed for the greatest public benefit."  *Id.* § 46-1-2.  Pursuant to both statute and decisions of the South Dakota Supreme Court, "all water within the state is the property of the people of the state" and held in the public trust.  *Id.* § 46-1-3; *Parks v Cooper*, 2004 S.D. 27, ¶ 53, 676 NW2d 823, 841 (2004).

46.     In Tennessee, "the waters of Tennessee are the property of the state and are held in public trust for the use of the people of the state."  TENN. CODE ANN. § 69-3-102(a).  It is the State's policy "to take all prudent steps to secure, protect, and preserve" Tennesseans' right to unpolluted waters.  *Id.*  Accordingly, the State has enacted a range of laws regulating the State's waters, including the Water Quality Control Act of 1977.  *See generally id.* § 69-3-101, *et seq.*

47.     Utah law provides that: "All waters in this state, whether above or under the ground, are hereby declared to be the property of the public, subject to all existing rights to the use thereof" UTAH CODE ANN. § 73-1-1(1). Consistent with this statutory provision, the State of Utah directly owns many waters and lands. The State of Utah also has a statutory duty to productively use this property for the public good, as its "Legislature shall govern the use of public water for beneficial purposes, as limited by constitutional protections for private property."  *Id.* § 73-1-1(3). The State

has carried out this statutory duty diligently, by enacting numerous laws to protect the State's waters, both on public and on private lands.  *See generally* UTAH CODE ANN. § 73-1-1 et seq.

48.     In Virginia, "the Commonwealth's water resources" are of "crucial importance" to preserve "the health and welfare of the people of Virginia" and "to assure further industrial growth and economic prosperity for the Commonwealth."  VA. CODE § 62.1-44.36.  Indeed, Virginia's Constitution declares it the "Commonwealth's policy to protect its … waters … for the benefit, enjoyment and general welfare of the people of the Commonwealth."  VA. CONST. art. XI, § 1. Virginia's General Assembly has charged the Commonwealth's officers with the duty to "protect[] and preserve[] [water rights] subject to the principle that all of the state waters belong to the public for use by the people for beneficial purposes without waste," and that the Commonwealth's water resources must be "balanced [for] multiple uses," including "human consumption," the "protection of wildlife" and "maximum economic development … for the benefit of the Commonwealth as a whole."  *Id.*  The Commonwealth has carried out this statutory duty diligently, enacting numerous laws to protect the State's waters.  *See generally* VA. CODE tit. 62.1, ch. 3.1.

49.     In Wyoming, the "water of all natural streams, springs, lakes or other collections of still water, within the boundaries of the state" is State property.  WYO. CONST. art. VIII, § 1.  It is also the State of Wyoming's policy that "water is one of Wyoming's most important natural resources, and the protection, development and management of Wyoming's water resources is essential for the long-term public health, safety, general welfare and economic security of Wyoming and its citizens."  WYO. STAT. ANN. § 35-11-309.  The State's constitutional and statutory provisions charge the State Engineer and the State Board of Control with the supervision, appropriation, distribution, and diversion of surface and groundwater use within Wyoming.  WYO. CONST. art. VIII, §§ 2, 5; *see also* WYO. STAT. ANN. §§ 41-4-502 through -511.  Consistent with

these obligations, the State of Wyoming has enacted laws providing for the regulation of its water resources.  *See, e.g.*, WYO. STAT. ANN. §§ 41-3-101; 35-11-302.  The State of Wyoming also submitted comments to the Agencies expressing its concerns about the draft proposal and then the Final Rule on February 7, 2023.

50.    As these laws show, state authority to regulate local lands and waters "is perhaps *the* quintessential state activity." *FERC v. Mississippi*, 456 U.S. 742, 767 n.30 (1982) (emphasis added).  This centrality means that "except where the reserved rights or navigation servitude of the United States are invoked, [a] State has total authority over its internal waters." *California*, 438 U.S. at 662.

51.    But under the Final Rule, once a water is determined to fall within the Agencies' authority, this determination eliminates the State's primacy to regulate and protect that water under the State's standards.  The Final Rule imposes significant federal burdens upon the States by forcing them to shift attention and resources to the federal scheme to the disadvantage of local, state-based programs.  In all cases, state regulation necessarily plays a secondary role when a state water becomes a "water of the United States."

52.    The States' use and management of the waters and lands they own or regulate will be subject to greater federal regulation under the Final Rule.  Moreover, the Final Rule's additional regulatory burden imposes a direct economic impact on the States, including by increasing the permitting costs associated with state-funded infrastructure projects or forcing the States to alter their plans for the affected land and water.  It also imposes an indirect economic impact on the States by expanding federal regulatory authority over businesses within the States whose operation will see higher permitting costs, thereby reducing taxes, royalties, and other payments to the States.

53.     The need for federal jurisdictional findings and permits also places significant burdens upon farmers, ranchers, homeowners, miners, energy providers, airports, business owners, and others within each of the Plaintiff States.  The Final Rule forces them to pay costly consultant and other fees merely to continue to conduct ordinary activities on their lands—even in cases where those activities could have no significant impact on navigable, interstate waters.  *See* 33 U.S.C. §§ 1342, 1344.  The ambiguity the Final Rule creates could lead to decreased property values for any property that even arguably might contain a covered water.  Given the "primary" role of the States in this area, balancing these burdens should be a choice primarily left to those States.  But the Final Rule assumes that anything less than a maximalist approach to water regulation represents an abdication of this traditional state role.  *See* 88 Fed. Reg. at 3065.

54.     *Second*, the Final Rule significantly increases the burden the States must bear related to the various programs run through the CWA.  The Agencies professed that they "d[id] not have the information available to assess what change in environmental benefits or compliance costs that individual States would bear under the final rule."  U.S. ENVTL. PROT. AGENCY & DEP'T OF THE ARMY, ECONOMIC ANALYSIS FOR THE FINAL "REVISED DEFINITION OF 'WATERS OF THE UNITED STATES'" RULE 49 (2022), *available at* https://bit.ly/40jczd8.  Even so, they declared that States would face only "de minimis" costs relative to the pre-2015 regime.  *Id.* at xii.  Not so.

55.     The CWA, for example, requires the States to enact Water Quality Standards (WQS) for waters within the definition of WOTUS and to revise the WQS as necessary.  33 U.S.C. §§ 1311(b)(1)(C), 1313(e)(3)(A); 40 C.F.R. §§ 130.3, 131.3(i), 131.4(a).  For waters that fail to meet the WQS, States must set pollution limits, called Total Maximum Daily Loads (TMDL), and apply the TMDL to the State's water quality management plan and National Pollution Discharge Elimination System (NPDES) permitting program.  40 C.F.R. § 130.7.  EPA admits that "[s]ome

States have developed standards for certain categories of water … that could be jurisdictional under the final rule but not jurisdictional under the secondary baseline of the 2020 NWPR, and others have not."  Economic Analysis, *supra*, at xix.  Because the Final Rule increases the number of waters subject to the CWA, the States must expend significant resources to immediately determine which waters were added to the Agencies' jurisdiction and decide if current WQS apply to these additional waters.  33 U.S.C. § 1313(c)(4)(B).

56.     If current WQS do not apply for particular waters, then the State must issue new WQS.  33 U.S.C. § 1313(c)(4).  If the State's WQS does not comply with the CWA, EPA's duty to establish a WQS for the State is triggered.  33 U.S.C. § 1313(c)(4)(B).  The State must also issue a TMDL in the case of non-compliant waters.  40 C.F.R. § 130.7.  The process of implementing these changes is expensive and places a significant strain on limited state resources.

57.     In addition, under the CWA, States must prepare and submit to the EPA a biennial water quality report describing "the water quality of all navigable waters in such State" and analyzing the extent to which individual waters support wildlife populations and recreational activities.  33 U.S.C. § 1315(b)(1)(A).  The Final Rule places more water bodies within the definition of "navigable waters," and therefore, requires the States to conduct more water quality assessments at significant expense to provide a complete report.

58.     The Final Rule also directly affects the States' administration of the NPDES permitting program.  *See* 33 U.S.C. § 1342; State Program Information, EPA https://bit.ly/3HlEPDg (last visited Feb. 13, 2023).  The States will receive additional federally mandated NPDES permit applications for discharging pollutants into waters now federally regulated as a result of the Final Rule.  33 U.S.C. §§ 1311, 1342.  The States will then be required to process these additional federally mandated CWA permit applications.  The same problem will

occur as to the CWA's requirement that all federal permit applicants obtain a state certification from the State in which the proposed discharge will occur.  *See* 33 U.S.C. § 1341.  By expanding the number of activities requiring a permit, and thus the number of permit applicants seeking certifications from the States, it's no surprise that the Agencies admit that States could face increased costs on these fronts, as well.  Economic Analysis, *supra*, at 66-67, 95.

59.     *Third*, the Final Rule imposes additional costs on the States as permit applicants themselves.  States will have to apply for their own federal permits to complete any range of infrastructure activities, including building roads, schools, hospitals and water pipelines.  By expanding the number of these activities that require a permit, the Final Rule imposes new direct costs on the States.  Expenses related to studies for current and future builds, topographic mapping, extensive surveys—all these actions require money.

60.     The Agencies did not take into account the unique ecological, geological, and hydrological differences among the States and have ignored the scientific expertise of the state regulators charged with protecting state resources under both federal and state law.  In fact, several of the States have unique hydrological features that no other areas of the country enjoy, including, for example, the extensive prairie pothole regions in North Dakota, South Dakota, and Montana that the Final Rule identifies as jurisdictional, 88 Fed. Reg. at 3031; the ephemeral streams that exist in several States, *id.* at 3029; or the permafrost wetlands and other wetlands comprising much of the North Slope in Alaska.  By failing to adequately consider these factors, the Agencies have woefully underestimated the impact of the Final Rule on state programs and budgets.

61.     *Fourth*, States must also bear substantial costs when named as a violator in a CWA "citizen suit."  33 U.S.C. § 1365(a), (g).  With the Final Rule creating confusion on multiple fronts over what is (and is not) WOTUS, the States are subject to a much greater risk of defending

themselves in these actions.  These litigation costs can stack up quickly.  And with the Final Rule

expanding the Agencies' jurisdiction as broadly as it has, this harm is not a question of "if," but

"when."

## BACKGROUND

### I.    The Clean Water Act

62.     Congress enacted the provisions at issue as part of the Federal Water Pollution

Control Act Amendments of 1972.  33 U.S.C. §§ 1251-1387.

63.     In the CWA, Congress gave the Agencies limited authority to regulate the discharge

of certain materials into "navigable waters" through permitting programs.  33 U.S.C. §§ 1341-

1346.  The CWA defines "navigable waters" as "the waters of the United States, including the

territorial seas."  *Id.* § 1362(7).

64.     The definition of WOTUS significantly alters at least three CWA programs that

affect the States.

65.     As noted above, one program involves establishing and revising WQS or goals for

each water body within the definition of WOTUS.  *See* 33 U.S.C. §§ 1311(b)(1)(C), 1313(e)(3)(A).

If a State's WQS does not comply with the CWA, EPA will create a WQS for the State.  *See* 33

U.S.C. § 1313(c)(3).  If waters fail to meet the WQS, the State must set TMDL limiting the amount

of a pollutant that can be discharged into the water while achieving the WQS.  *See* 40 C.F.R.

§ 130.7.  The State must then apply the TMDL to its water quality management plan and permitting

programs.  *Id.*  Each State must also biennially submit a water quality report to EPA describing

"the water quality of all navigable waters in such State" and analyzing the extent to which these

waters provide for "the protection and propagation of a balanced population of shellfish, fish, and

wildlife, and allow recreational activities in and on the water."  33 U.S.C. § 1315(b)(1)(A)-(B).

66.     Another program is the NPDES permitting program.  Under the CWA, anyone seeking to discharge material into WOTUS must obtain a permit from either the States or EPA for pollutants, or the Corps for dredge or fill material.  *See* 33 U.S.C. §§ 1311(a), 1342, 1344, 1362(12).  "The discharge of a pollutant" includes "'any addition of any pollutant to navigable waters from any point source,' and 'pollutant' is defined broadly to include not only traditional contaminants but also solids such as 'dredged spoil, … rock, sand, [and] cellar dirt.'"  *Rapanos*, 547 U.S. at 723 (plurality op.) (citing 33 U.S.C. §§ 1362(12), 1362(6)).  The States serve as the primary administrative authority for the NPDES permitting program, and help the Corps administer the dredge and fill permitting program.  33 U.S.C. §§ 1342, 1344.

67.     Obtaining a discharge permit from the Agencies is an expensive and uncertain process—it can take years and cost tens and hundreds of thousands of dollars.  *See* 33 U.S.C. §§ 1342, 1344 (describing the discharge permitting process).  "For a specialized 'individual' permit … one study found that the average applicant 'spends 788 days and $271,596 in completing the process,' without 'counting costs of mitigation or design changes.'"  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 594-95 (2016) (quoting *Rapanos,* 547 U.S. at 721).  "Even more readily available 'general' permits took applicants, on average, 313 days and $28,915 to complete."  *Id.* at 595.

68.     Discharging into WOTUS without a permit can subject an individual to "crushing" "criminal penalties and steep civil fines" for even an "inadvertent violation[]" of the CWA, *Cnty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1489 (2020) (Alito, J., dissenting).  Fines can climb to as high as $64,618 per violation, per day on the civil side, and fines and penalties of up to 15 years imprisonment on the criminal side for certain violations.  33 U.S.C. §§ 1311, 1319, 1342, 1344, 1362, 1365; 40 C.F.R. § 19.4.

69.     There are several ways a party—including the Plaintiff States—can be put at risk of facing penalties.  One way, of course, is through enforcement by the Agencies.  *See*, *e.g.*, 33 U.S.C. § 1319.  Another is through CWA "citizen suits."  A citizen suit may be filed by any "person or persons having an interest which is or may be adversely affected" against "any person," including "any … governmental instrumentality or agency to the extent permitted by the eleventh amendment to the [U.S.] Constitution[] who is alleged to be in violation of … an effluent standard or limitation under this chapter or … an order issued by the Administrator or a State with respect to such a standard or limitation."  33 U.S.C. § 1365(a), (g).

70.     The final program is one where all CWA permit applicants, whether for pollutants or dredge and fill material, are required to obtain a statement from the State in which the discharge will occur, certifying that the discharge will comply with the State's WQS.  33 U.S.C. § 1341(a)(1).

## II.     CWA Regulations and Law: 1974 to 2023

71.     For a century before the CWA, the Supreme Court interpreted the phrase "navigable waters of the United States" in the CWA's predecessor statute to refer to "navigable in fact" interstate waters.  *The Daniel Ball*, 77 U.S. 557, 563 (1870).

72.     In keeping with this traditional understanding, the Corps' first rule under the CWA in 1974 defined "navigable waters" as those waters that have been, are, or may be used for interstate or foreign commerce.  39 Fed. Reg. 12119 (Apr. 3, 1974).

73.     After a federal district court enjoined that initial rule, see *Nat. Res. Def. Council v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975), the Agencies sought on remand to expand their regulatory jurisdiction to include areas never before subject to federal permitting requirements, 40 Fed. Reg. 31320 (July 25, 1975).  Those 1975 regulations defined WOTUS to include navigable waters and their tributaries, as well as non-navigable intrastate waters that could affect interstate commerce.  *Id.* at 31324-25.

74.    In 1986, the Corps tried to expand its jurisdiction under the CWA yet further. Under the 1986 Regulations, "waters of the United States" included traditional navigable waters, interstate waters, intrastate waters whose use or degradation could affect interstate commerce, and tributaries of all those waters, as well as wetlands adjacent to these waters and tributaries, and waters used as habitat by migratory birds that either are protected by treaty or cross state lines.  51 Fed. Reg. 41206-60 (Nov. 13, 1986).

75.    In the last fifteen years, the Supreme Court has reviewed two aspects of the Agencies' definition of WOTUS under the 1986 regime.  In both instances, the Court rejected the Agencies' assertion of authority over non-navigable, intrastate waters.

76.    In *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers*, the Supreme Court rejected the Corps' assertion of jurisdiction over any waters "[w]hich are or would be used as habitat" by migratory birds.  531 U.S. 159, 164 (2001) (*SWANCC*) (quoting 51 Fed. at 41217).  The Court in *SWANCC* explained that Congress did not authorize the Agencies to regulate "nonnavigable, isolated, intrastate waters," like seasonal ponds.  *Id.* at 171.

77.    The Court added that regulation of isolated waters like these would invoke "the outer limits of Congress' power," have the effect of "alter[ing] the federal-state framework by permitting federal encroachment upon a traditional state power," and raise "significant constitutional questions" regarding the CWA's constitutionality.  *Id.* at 172-74.  Congress, the Court concluded, did not intend to create such difficult constitutional questions, nor press the outer boundaries of its constitutional authority.  *Id.*

78.    *SWANCC* included the first instance of the "significant nexus" term that ultimately became a centerpiece of the Final Rule.  But it did so in passing, while characterizing an even earlier decision, *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985).  And

it gave the term a narrow read: *SWANCC* perceived *Riverside Bayview* to hold that the non-navigable wetlands in that case could constitute WOTUS only because they were "inseparably bound up" with "conventionally defined" waters.  *Id.* at 134; *see also SWANCC*, 531 U.S. at 167.

79.     In *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court also rejected the Agencies' assertion of authority over non-navigable, intrastate waters that are not significantly connected to navigable, interstate waters.  *Rapanos* dealt with whether non-navigable tributaries of traditional navigable waters are within the Agencies' jurisdiction and, if so, in what circumstances.  The Court's majority consisted of two opinions.  Both rejected the Agencies' position.

80.     A four-justice plurality held that only "relatively permanent, standing or continuously flowing bodies of water," as well as secondary waters with a "continuous surface connection" to those relatively permanent waters, qualify as "waters of the United States."  *Id.* at 739-42.  "Wetlands with only an intermittent, physically remote hydrologic connection," the plurality explained, do not fall within the Agencies' jurisdiction.  *Id.* at 742.

81.     Justice Kennedy, writing for himself, explained that the Agencies' jurisdiction extends only to primary "waters that are navigable in fact or that could reasonably be so made" and secondary waters with a "significant nexus" to primary waters.  *Id.* at 759.  To satisfy that nexus, the secondary waters must "significantly affect the chemical, physical, *and* biological integrity of primary waters."  *Id.* at 780 (emphasis added).

82.     Under Justice Kennedy's interpretation, the Agencies could not assert jurisdiction over all "wetlands (however remote) possessing a surface-water connection with a continuously flowing stream (however small)."  *Id.* at 776-77.  Justice Kennedy added that the Agencies' position would impermissibly "permit federal regulation whenever wetlands lie alongside a ditch

28

or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id.* at 778.

83.     Thus, in both *SWANCC* and *Rapanos*, the Court remained firm that an expansive definition of jurisdictional waters would exceed Congress's powers under the Commerce Clause. *See Rapanos*, 547 U.S. at 738 (plurality op.) (rejecting significant nexus test on this ground); *SWANCC*, 531 U.S. at 173 (rejecting broad agency construction based on similar concerns).

84.     The Eighth Circuit has held that jurisdiction is proper if "either the plurality or Justice Kennedy's test" is met. *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009). The Supreme Court has not yet addressed this question. But it is expected to weigh in soon on this and other issues related to the CWA's jurisdictional reach in *Sackett v. EPA*, 142 S. Ct. 896 (2022) (granting petition for writ of certiorari).

85.     After *Rapanos*, the Agencies issued a guidance document explaining the approach the Agencies would use to determine whether waters were subject to the CWA. U.S. ENVTL. PROT. AGENCY & U.S. ARMY CORPS OF ENG'RS, CLEAN WATER ACT JURISDICTION FOLLOWING THE U.S. SUPREME COURT'S DECISION IN *RAPANOS V. UNITED STATES* & *CARABELL V. UNITED STATES* (Dec. 2, 2008) ("*Rapanos* Guidance"), *available at* https://bit.ly/3RXUs8E. The guidance document asserted that the Agencies would exercise per se jurisdiction over:

(1)     "traditional navigable waters";

(2)     "wetlands adjacent to traditional navigable waters";

(3)     "non-navigable tributaries of traditional navigable waters that are relatively permanent where tributaries typically flow year-round or have continuous flow at least seasonally"; and

(4)     "wetlands that abut such tributaries."

*Id.* at 1.

86.     The Agencies also asserted case-by-case authority, as they deemed appropriate, over:

(1)     "non-navigable tributaries that are not relatively permanent";

(2)     "wetlands adjacent to non-navigable tributaries that are not relatively permanent"; and

(3)     "wetlands adjacent to but not directly abutting a relatively permanent non-navigable tributary."

*Id.*

87.     Critically, the Agencies announced that they planned to identify jurisdictional waters using reasoning drawn from the *Rapanos dissenters'* view of the operative test; that is, CWA jurisdiction "exists over a water body if either the plurality's [relatively permanent] or Justice Kennedy's [significant nexus] standard is satisfied." *Id.* at 3 & n.16 (citing *Rapanos*, 547 U.S. at 810 (Stevens, J., dissenting) ("judgments should be reinstated if either of those tests is met")).

88.     The guidance document also stated that, by its own terms, it did "not impose legally binding requirements on EPA, the Corps, or the regulated community, and may not apply to a particular situation depending on the circumstances." *Rapanos* Guidance, *supra*, at 4 n.17.

89.     Legally binding requirements incorporating *Rapanos* would not come until June 2015, when the Agencies published a final rule entitled "Definition of 'Waters of the United States' Under the Clean Water Act." 80 Fed. Reg. 37054-127 (June 29, 2015). This rule embraced a novel and sweeping view of the Agencies' jurisdiction.

90.     Among other things, the 2015 Rule declared that all "tributaries" of waters used in interstate commerce (and certain other "primary" waters) were *per se* jurisdictional waters. 33 C.F.R. § 328.3(c)(3) (2015). All waters "adjacent" to primary waters, impoundments, and

tributaries—including those that were merely "neighboring" waters—were swept into WOTUS, too. 33 C.F.R. § 328.3(c)(1) (2015); 40 C.F.R. § 230.3(o)(3)(i) (2015).  And the 2015 definition covered *all* interstate waters (including non-navigable ones) and any intrastate waters adjacent to them.  *See* 33 C.F.R. § 328.3(a)(2), (7) (2015); 40 C.F.R. § 230.3(o)(3)(i), (1)(vii) (2015).  Lastly, as relevant here, the 2015 Rule swept in any "similarly situated waters in the region" of a primary water that would "significantly affect[] the chemical, physical, or biological integrity" of a primary water.  *See* 33 C.F.R. § 328.3(c)(5) (2015); 40 C.F.R. § 230.3(o)(3)(v) (2015).

91.     Many of the Plaintiff States challenged the rule in district court.  Several courts, including this one, stayed its implementation.  *See, e.g.*, *North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356 (S.D. Ga. 2018).  The rule was eventually remanded to the Agencies for "read[ing] the term navigability out of the" statute.  *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1358 (S.D. Ga. 2019).

92.     In 2019, the Agencies published a final rule repealing the 2015 Rule and temporarily recodifying the 1986 Regulations.  *See* 84 Fed. Reg. 56626 (Oct. 22, 2019).  Three months later, the Agencies issued another final rule—the Navigable Waters Protection Rule (NWPR)—that defined "waters of the United States" in accordance with the *Rapanos* plurality opinion.  *See* 85 Fed. Reg. 22250 (Apr. 21, 2020).  The NWPR provided predictability and clarity by identifying four easily understandable categories of jurisdictional waters: (1) the territorial seas and traditional navigable waters; (2) tributaries of those waters; (3) certain lakes, ponds, and impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters (other than jurisdictional wetlands).  "Significant nexus" and other ambiguous standards were absent.  Interstate waters were also not included in WOTUS.  And several types of waters, such as ditches and ephemeral streams, were categorically excluded.

93.     The certainty that the NWPR offered was short-lived.  Without making any merits determination, a district court granted the Agencies' motion for voluntary remand in a challenge to the NWPR and vacated the rule.  *See generally Pascua Yaqui Tribe v. EPA*, 557 F. Supp. 3d 949 (D. Ariz. 2021).

94.     The Agencies then published a proposed new rule for comment in December 2021. *See* 86 Fed. Reg. 69372 (Dec. 7, 2021).  In short, the Proposed Rule outlined returning to a purportedly modified version of the pre-2015 WOTUS framework.  The Agencies received roughly 114,000 comments in response, 88 Fed. Reg. at 3019, including comments from most of the Plaintiff States in strong opposition, *see, e.g.*, State of West Virginia, *et al.*, Comment Letter on Proposed Rule Entitled "Revised Definition of 'Waters of the United States'" (Feb. 7, 2022) *available at* http://bit.ly/40YBNhs (24-State letter); State of North Dakota, Comment Letter on Proposed Rule Entitled "Revised Definition of 'Waters of the United States'" (Feb. 7, 2022), *available at* http://bit.ly/3E4HKiI.

95.     Despite substantial pushback to their proposal, the Agencies morphed the Proposed Rule into a *more* expansive understanding of "waters of the United States" when it issued the Final Rule.

96.     For instance, as discussed below, the Final Rule defines "significant nexus" to mean "material influence," a recharacterization of the key test that the Agencies did not signal in the Proposed Rule.

97.     Ultimately, the Final Rule asserts WOTUS jurisdiction (with limited exceptions) over five categories of land and water:

(1)     Traditional navigable waters, territorial seas, and interstate waters;

(2)     Impoundments of "waters of the United States";

(3)     Tributaries to traditional navigable waters, territorial seas, interstate waters, or impoundments, where those tributaries meet either the relatively permanent or significant nexus standard;

(4)     Wetlands that are adjacent to:

  a.   Traditional navigable waters, territorial seas, and interstate waters;

  b.   Relatively permanent impoundments or tributaries, where the wetlands bear a continuous surface connection with those impoundments or tributaries; or

  c.   Non-relatively permanent impoundments and tributaries where the wetlands meet the significant nexus standard.

(5)     Other intrastate lakes, ponds, streams, or wetlands that meet either the relatively permanent or significant nexus standard.

88 Fed. Reg. at 3142.

98.     In the Final Rule, the Agencies repeatedly relied on scraps of legislative history to argue that they were justified in pursuing "the broadest possible constitutional interpretation" of their own jurisdictional provision.  88 Fed. Reg. at 3008 (quoting S. REP. NO. 92-1236, at 144 (1972) (Conf. Rep.)).  Yet that same legislative history—such as it is—stresses that waters must comprise part of the "continuing [water] highway over which commerce is or may be carried on with other States" before they can constitute "waters of the United States."  118 CONG. REC. 33,699 (1972) (statement of Senator Muskie); *see also id.* at 33,756-57 (statement of Rep. Dingell) ("[I]t is enough that the waterway serves as a link in the chain of commerce among the States as it flows in the various channels of transportation[.] … The 'gist of the Federal test' is the waterway's use 'as a highway.'").

**III.   Expansion of Authority Beyond Both the 1986 Regulations and the Pre-2015 Regime**

99.     The Agencies' drumbeat describing the Final Rule is that it breaks no new ground: They repeatedly insist that it is "founded on the familiar framework of the longstanding 1986 regulations," 88 Fed. Reg. at 3007, and the "familiar pre-2015 definition," *id.* at 3005.  But it isn't.

Rather than being "generally consistent with the pre-2015 regulatory regime," *id.* at 3007, it marks another significant expansion of the Agencies' regulatory authority.

100.    The Final Rule returns to the flawed approach of adopting the *Rapanos* dissent, allowing for jurisdiction where a water meets *either* the relatively permanent or significant nexus standard.  *See Rapanos*, 547 U.S. at 810 & n.14 (Stevens, J., dissenting) ("In future cases the United States may elect to prove jurisdiction under either test." (cleaned up)).  And many examples show that the way the Final Rule understands this approach leads to broader results than under the pre-2015 regime.

101.    *First*, for example, the Agencies now offer a new construction of "relatively permanent" for tributaries—one they borrowed from the defunct 2015 Rule.

102.    Under pre-2015 regulatory practice, the Agencies required year-round flow or water flow "at least seasonally (*e.g.*, typically three months)."  88 Fed. Reg. at 3085.

103.    But under the Final Rule, a tributary will be considered "relatively permanent" if it contains "flowing or standing water year-round or continuously during certain times of the year." *Id.* at 3084.  This does not necessarily mean every year, though.  The standard for whether land counts as WOTUS is whether it contains water for "more than for a short duration."  *Id.* at 3087. The Final Rule requires no "specific flow duration" for tributaries, and even tributaries that "may run dry [for] years" may be covered.  *Id.* at 3085.

104.    *Second*, the Agencies have also altered the definition of the "significant nexus" standard (borrowed again from the since-rejected 2015 Rule), which further extends their grasp over tributaries.

105.    Under the pre-2015, post-*Rapanos* framework, the Agencies would have determined if a significant nexus existed by asking whether tributaries and "adjacent" wetlands

would "significantly affect the chemical, physical *and* biological integrity of downstream traditional navigable waters." *Rapanos* Guidance, *supra*, at 8.

106.     But under the Final Rule, the Agencies will ask whether a tributary, "in combination with other similarly situated waters in the region," 88 Fed. Reg. at 3066, has a "material influence on the chemical, physical, *or* biological integrity of" a traditionally navigable water, territorial sea, or interstate water, *id.* at 3067 (emphasis added).   In other words, "significant nexus" has shifted in three ways: Tributaries and other waters will now be treated together if they are merely in the same "region," not adjacent to each other.   A "significant" effect has been reduced to a merely "material influence."   And the tributary and similarly situated waters must only have an effect on one of the three aspects of the test, not all three.   This "significant nexus" standard is broader than Justice Kennedy's articulation in *Rapanos*.   And it is an ambiguous, qualitative standard that in practice leaves jurisdiction largely to the Agencies' case-by-case discretion.

107.     *Third*, even the definition of a tributary has changed.   In the pre-2015 scheme, "[a] non-navigable tributary of a traditional navigable water [wa]s a non-navigable water body whose waters flow into a traditional navigable water either directly or indirectly *by means of other tributaries*." *Rapanos* Guidance, *supra*, at 6 (footnote omitted; emphasis added).   Now, however, a watercourse can qualify as a tributary so long as it makes its way to a traditional navigable water, territorial sea, or interstate water by any wet *or dry* waterway, such as wetlands, ditches, or waste treatment centers.   88 Fed. Reg. at 3080.

108.     *Fourth*, the Agencies have expanded their reach over wetlands, too.

109.     Pre-2105, adjacent wetlands could be treated as covered waters when they maintained "a continuous surface connection with a relatively permanent, non-navigable tributary." *Rapanos* Guidance, *supra*, at 7.   To qualify under this standard, the wetland must

"directly abut[] the tributary" and "not [be] separated by uplands, a berm, dike, or similar feature." *Id.*

110.    No longer.  Under the Final Rule, "a natural berm, bank, dune, or similar natural landform between an adjacent wetland and a relatively permanent water does not [necessarily] sever a continuous surface connection."  88 Fed. Reg. at 3095.  If the Agencies deem a wetland to have this kind of illusory "continuous" surface connection, then it becomes a covered water without any further analysis—not even under the itself too-broad significant-nexus test.  No direct abutment required.  Moreover, there need not even be water for a "continuous surface connection." *Id.* ("A continuous surface connection does not require a constant hydrologic connection.").  For example, a wetland can be deemed a jurisdictional water if it is connected to a relatively permanent tributary by way of a non-jurisdictional "swale"—that is, land dip. *Id.*

111.    *Fifth*, the Agencies' revised definition of "significant nexus" has consequences for adjacent wetlands, too.  Here again, when looking for a significant nexus, the Agencies consider other waters "in the region" that might combine with a given wetland to produce a "material" influence on traditional navigable waters, the territorial seas, and interstate waters.  If this standard is met, the water is covered.  88 Fed. Reg. at 3090.  So, for example, a "reasonably close" wetland might now become a jurisdictional water if, combined with other wetlands in the same catchment, it has some ill-defined "material" effect on a non-navigable interstate water. *Id.* at 3089.  To illustrate, this standard risks subjecting much of Alaska's North Slope—an area spanning over 94,000 square miles and riddled with permafrost wetlands and other wetlands—to the Agencies' jurisdiction. *Id.* at 3093.

112.    *Sixth* and perhaps most troublingly, the Final Rule creates a broad catch-all category for any other *intra*state lakes, ponds, streams, and wetlands that meet either the relatively-

permanent or significant-nexus standards. *Id.* at 3097-98. This is a significant change: Courts have rejected the Agencies' arguably more defensible attempts to place all *inter*state waters under the Agencies' umbrella in past rulemakings. *See*, *e.g.*, *Wheeler*, 418 F. Supp. 3d at 1360 ("[T]he Agencies' inclusion of all interstate waters within the definition of waters of the United States in the WOTUS Rule extends beyond their authority under the CWA.").

113.   This sweeping intrastate waters category has no predecessor in the pre-2015 regime. Its closest analogue was the catch-all in the 1986 Regulations governing intrastate waters that affected interstate commerce, but even then the Agencies "ha[d] not in practice asserted jurisdiction over [those waters] under the pre-2015 regulatory regime" in light of *SWANCC*. 88 Fed. Reg. at 3102-03.

114.   This last category bakes in all the problematic elements of the preceding regulations, including broad understandings of "similarly situated" waters "in the region" that can in turn be used to establish a "material influence" on navigable waters, the territorial seas, and interstate waters. Practically speaking, a landowner with any intermittent moisture on her property will need to consider whether any waters in a surrounding and ill-defined "region" can join with hers to produce some "material" effect on an aspect (chemical, biological, *or* physical) of navigable waters, the territorial seas, and interstate waters of some indeterminate distance away. Dried up prairie potholes and backyard fishing holes might qualify for coverage. And because "subsurface connections" can provide a "substantial nexus," the landowner may not even know that she has relevant "waters"—let alone "waters of the United States"—by looking at her own property. 88 Fed. Reg. at 3093. Thus, water and land that is not a part of any stream network at all can now be "waters of the United States" under this catch-all category. *Contra SWANCC*, 531 U.S. at 171 (explaining that WOTUS does not embrace "nonnavigable, isolated, intrastate waters").

115.    In short, the Final Rule is not merely a codification of longstanding policy.  If anything, by relying on vague standards and broad conceptions of agency power, the Final Rule echoes many aspects of the now-defunct 2015 Rule.  The Agencies even rely—over and over again—on the same "Science Report" that led them to issue the vacated 2015 Rule.  *See* 88 Fed. Reg. at 3035 ("[T]he significant nexus standard in this rule reflects the analysis in the [2015] Science Report."); *see also*, *e.g.*, *id.* at 3006, 3026, 3029, 3030, 3033.  And their flawed methodology sweeps in most of the same waters that courts rightly concluded Congress did not and perhaps could not subject to federal oversight.

## IV.    Other Unlawful Aspects of the Final Rule

116.    There are other definitional problems in the Final Rule aside from incongruence with the Agencies' own pre-2015 regime.

117.    The Final Rule covers *all* interstate waters, regardless whether they are navigable or bear any relationship to other navigable water.  88 Fed. Reg. at 3072.  Tributaries to these interstate waters, wetlands adjacent to them, and other bodies of water that meet the relatively permanent or significant nexus standard are likewise treated as jurisdictional waters.  *Id.* at 3006. No exclusions apply.  *Id.* at 3103-04.  So the Agencies are purporting to regulate a broad class of waters that are in no sense navigable.

118.    The Final Rule treats impoundments as jurisdictional waters, too, if they are either WOTUS at the time of impoundment or WOTUS at the time of assessment.  88 Fed. Reg. at 3078. Thus, the Agencies assert authority over waters that might not otherwise have qualified for WOTUS were it not for their status at some prior time—perhaps years or decades in the past.  *Id.* The impoundment provisions apply even if the impoundment bears no "hydrologic connection to [a] tributary network."  *Id.*

119.    The Agencies also assert broad authority over "perennial, intermittent, and ephemeral streams." *Id.* at 3030.  The Agencies reason that "[a]ll tributary streams, including perennial, intermittent, and ephemeral streams, are chemically, physically, and biologically connected to larger downstream waters via channels and associated alluvial deposits where water and other materials are concentrated, mixed, transformed, and transported." *Id.*  For this reason, the Final Rule outright rejected the *Rapanos* plurality's contrary conclusion that regulating these waters would exceed the CWA's limits.  *Id.* at 3040, 3052-53.  Moreover, the Final Rule excludes "swales and erosional features … characterized by low volume, infrequent, or short duration flow." *Id.* at 3144.  Other than referring to the idea that swales and the like are more "deeply incised" and lack a high watermark, the Agencies do not explain how they will determine which bodies qualify for this exclusion—much less how, practically speaking, they will treat an intermittent water flow in a given case.  88 Fed. Reg. at 3084.

120.    The Final Rule further employs a definition of "adjacency"—for purposes of determining when a wetland is "adjacent" to jurisdictional water and accordingly may also qualify as jurisdictional—that provides no practical limit on the agency's discretion.  A wetland must be "bordering, contiguous, or neighboring" to be adjacent.  *Id.* at 3006.  This definition emphatically does not require "direct abutment," *id.* at 3028, but the Agencies refused to provide any "bright-line rules" for what it does need, *id.* at 3089.

121.    Instead, the Agencies listed a variety of ambiguous features that can show adjacency while leaving landowners to guess what will not.  In "identifying wetlands," for example, the Agencies say they "will ordinarily consider all wetlands within a wetland mosaic collectively."  88 Fed. Reg. at 3093.  Physical, dry features—like a pipe—can be enough to show adjacency.  *Id.*  Wetlands behind a berm or barrier qualify, too.  *Id.* at 3027-28.  "Artificial

structures" do not divide wetlands where indicators like the "permeability of the soils" show that "hydrologic connection is maintained." *Id.* at 3094.  Similarly, a "subsurface connection between a wetland and another water can demonstrate adjacency," *id.* at 3092, and surface water is *not* required, *id.* at 3096.  Wetlands must only be "reasonably close," and what that means "depends on regional variations in climate, landscape, and geomorphology." *Id.* at 3089.  And the Agencies may determine that a by-all-accounts dry piece of land constitutes an adjacent, covered wetland by consulting "aerial photographs" of "vegetation" or "soil maps." *Id.* at 3096.  Flawed as it was, even the 2015 Rule attempted to draw clearer lines, focusing on features "located within [a primary water's] 100-year floodplain" and waters at least partially "located within 4,000 feet of the high tide line or ordinary high water mark of a" primary water, impoundment, or tributary with a significant nexus to a primary water.   33 C.F.R. § 328.3(a)(8) (2015); 40 C.F.R. § 230.3(o)(31)(viii) (2015).

122.    Thus, the Final Rule is no return to a stable and easily administrable regulatory framework.  All throughout the Rule, the Agencies have adopted provisions that are beyond the CWA's text, mirror or exceed the 2015 Rule's aggression, and are practically useless in providing meaningful guidance when it comes to what is—and what (if anything) is *not*—"waters of the United States."

## CLAIMS FOR RELIEF

### COUNT ONE

**Violation of the Administrative Procedure Act and the Clean Water Act
In Excess of Statutory Jurisdiction, Authority, or Limitations
(5 U.S.C. § 706(2)(C); 33 U.S.C. § 1251, *et seq.*)**

123.    The Plaintiff States incorporate the preceding paragraphs by reference.

124.    A final agency action, like the Final Rule at issue here, shall be held "unlawful and set aside" if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right." 5 U.S.C. § 706(2)(C).  In other words, all rules must be consistent with their authorizing statutes.

125.    The CWA, 33 U.S.C. § 1251-1387, is the authorizing statute for the Final Rule. The Final Rule is not consistent with it.

126.    The CWA authorizes the Agencies to assert jurisdiction over only "navigable waters," defined as "waters of the United States."  33 U.S.C. §§ 1311(a), 1342(a), 1344(a), 1362(7), (12).

127.    The Final Rule's definition of "waters of the United States" runs contrary to the plain language of the CWA.  In several respects, the Agencies construed WOTUS to embrace land and waters that cannot be termed "navigable waters" under any plausible interpretation of that phrase.

128.    *First*, the Final Rule reaches "tributaries" that—for years at a time—may be nothing more than land that water formerly crossed.  By focusing on undefined typography, vegetation, and sediment, the Final Rule otherwise describes tributaries in such a subjective fashion that the Agencies may be free to extend jurisdiction over any number of places that bear no relationship to navigable waters.

129.    *Second*, the Final Rule reinterprets "significant nexus"—a term that is itself a questionable step away from the statutory text—in a way that is inconsistent with any prior understanding.  The Final Rule permits the Agencies to declare that water has a "significant nexus" with a navigable water, territorial sea, or interstate water when it (alone or combined with other waters in an undefined region) has only the most minimal "influence" on one of three aspects (chemical, physical, or biological) of the jurisdictional water.

130.    *Third*, wetlands can be declared "adjacent" under an ambiguous standard that, practically speaking, the Agencies could apply to reach just about any waters or lands.  Physically separated wetlands that are merely "neighbors" to another water, making them "reasonably close," can all be lumped together to produce the requisite nexus even if they individually bear no relationship with a navigable water.

131.    *Fourth*, impoundments may be dubbed WOTUS even though, by the Agencies' own acknowledgement, the impounded waters are not presently "waters of the United States." Instead, the Final Rule declares that impoundments may be WOTUS today based solely on the impounded waters' past status as WOTUS—a judgment that the CWA's present-tense focus does not allow.

132.    *Fifth*, all interstate waters qualify as WOTUS under the Final Rule even if they are not navigable and bear no relationship whatsoever to navigable waters.  And other waters that relate to them (as described in the Final Rule) can also be deemed jurisdictional, even though they have no relationship to navigable waters, either.  Each of these aspects is inconsistent with the statute.

133.    *Sixth*, other intrastate waters qualify under the Agencies' ambiguous and overbroad constructions of either the relatively permanent or significant nexus test.  These waters entirely within a State's borders can be deemed jurisdictional despite their ephemeral nature and despite no physical connection to a navigable-in-fact water.  Adopting lenient tests—tests that permit almost anything to be jurisdictional if a loose connection of dots can lead to some navigable water—ensures that the Agencies can cover almost *all* waters.  "Virtually all water, polluted or not, eventually makes its way to navigable water." *Cnty. of Maui*, 140 S. Ct. at 1470.

134.    And *seventh*, the Final Rule's definition stretches far beyond both the plurality and concurring opinions in *Rapanos v. United States*, 547 U.S. 715 (2006).   The Agencies' interpretation of the tests in those opinions lets them reach even the most intermittent flows, isolated waters, and mostly dry land features, none of which the five non-dissenting *Rapanos* justices contemplated as falling within WOTUS.   In addition, the Agencies make plain that though they are willing to take jurisdiction under either theory, their principal concern is the "significant nexus" test—adopted in only a one-judge concurring opinion.

135.    The Final Rule also improperly upsets the balance of State and federal powers in an area typically dominated by the States.   As explained above, water and land management is a domain of substantial and traditional state interest.   Despite that long-recognized state authority, the Final Rule places the federal government's interests ahead of the States' as to a variety of intrastate waterways, lands with no surface waters at all, and other geographic features traditionally understood to fall under state control.   State power is further subjugated to the Agencies because the States are compelled to divert and devote resources to administering federal permitting and other water regulation schemes.   Ordinarily, States would be free to choose how to devote resources to water and land management and conservation.

136.    "Absent a clear statement of intention from Congress, there is a presumption against a statutory construction that would significantly affect the federal-state balance."   *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1067 (5th Cir. 1984); *see also United States v. Bass*, 404 U.S. 336, 349 (1971).   The CWA does not contain any clear statement of this sort.   Quite the opposite: the CWA specifically recognizes, preserves, and protects the primary responsibilities of the States to plan the development and use of their land and water resources.   33 U.S.C. § 1251(b). The federalism canon therefore counsels that the Final Rule goes too far.

137.    The Final Rule further runs afoul of the major questions doctrine.  Courts will not assume that an agency has "'unheralded' regulatory power over a 'significant portion of the American economy'" without clear congressional intent.  *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022).  Instead, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).  The Supreme Court has also required Congress to use "exceedingly clear language" to "alter the balance between federal and state power and the power of the Government over private property."  *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021).

138.    The Final Rule purports to tackle a question that is major in every sense.  It will require thousands—or potentially millions—of landowners in every corner of the country to take expensive compliance efforts whenever their property might implicate navigable water in the most distant way.  The Final Rule can be expected to directly and substantially impact major industries of all stripes, including farming and ranching, energy and mining projects, infrastructure, construction, and homebuilding.  So the vagueness the Final Rule embodies can be expected to cast a pall over our entire Nation's economy, including all those of the States.

139.    The Final Rule points to nothing in the CWA that provides a clear statement of Congress's intent for the Agencies to take on a jurisdictional reach of this scale.  The lone jurisdictional provision speaks of waters—not land—and navigability—not isolated moisture. These words imply a congressional intent to confine the Agencies to their appropriate role of regulating waters truly connected to traditional navigable waterways or that otherwise present a problem of national interest.  If Congress had intended the Agencies to instead regulate the vast majority of the country's land and water (a constitutionally dubious proposition to begin with),

then it would have spoken with directness and clarity in the CWA when laying out such an all-encompassing range of jurisdiction.

140.    Further, the Supreme Court has explained that courts will not "lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).   Thus, an agency interpretation of a statute that would cause the statute to swell to the outer limits of Congress's authority is impermissible, unless Congress clearly expressed such an intent.   *Id.*; *see also Almendarez-Torres v. United States*, 523 U.S. 224, 237-38 (1998) (explaining that, if "fairly possible," courts will construe a statute "to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score").

141.    Were it correct, the Final Rule's overbroad construction of WOTUS would also raise serious doubts about the CWA's constitutionality under the non-delegation doctrine.   Under Article I, Section 1 of the U.S. Constitution, Congress is vested with the legislative power.   And "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).   So to delegate its power to another branch, Congress must (at a minimum) "lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (cleaned up) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)).   If Congress fails to provide an intelligible principle, then the grant of authority is a constitutionally "forbidden delegation of legislative power." *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton*, 276 U.S. at 409).

142.    In the Final Rule, the Agencies claim sweeping power to regulate lands and waters far and wide.  Determining that this broad jurisdiction exists—and applying it in a concomitantly broad way—is a legislative determination in the purest sense.  "Congress alone controls [an agency]'s jurisdiction."  *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 71 (2009).  But Congress has not given the Agencies any intelligible standards to apply; "waters of the United States" "was not a term of art with a known meaning; and the words themselves are hopelessly indeterminate."  *Sackett v. EPA*, 566 U.S. 120, 133 (2012) (Alito, J., concurring).  If the Agencies were right about the CWA's effectively limitless reach, then Congress would have needed to say more.  After all, the "degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."  *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 672 (6th Cir. 2021); *see also Schechter Poultry*, 295 U.S. at 521-22.

143.    The rule of lenity further counsels for a narrower understanding of "waters of the United States" than that reflected in the Final Rule.  This "time-honored interpretive guideline serves to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability."  *Crandon v. United States*, 494 U.S. 152, 158 (1990) (cleaned up).  And "[b]ecause [courts] must interpret the statute consistently," the rule of lenity applies to any statute, like the CWA, that "has both criminal and noncriminal applications," no matter whether the rule is raised in the civil or criminal context.  *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004).  The Final Rule, however, offends the rule of lenity by construing any ambiguities in the statute in some of the broadest possible ways.

144.    For these and other reasons, the Court should deem the Final Rule unlawful and set it aside for "exce[eding] [the Agencies'] statutory jurisdiction [and] authority," 5 U.S.C. § 706(2)(C), granted to it under the Clean Water Act, 33 U.S.C. § 1251-1387.

## COUNT TWO

**Violation of the Administrative Procedure Act
Arbitrary, Capricious, an Abuse of Discretion,
or Otherwise Not In Accordance With Law
(5 U.S.C. § 706(2)(A))**

145.    The Plaintiff States incorporate the preceding paragraphs by reference.

146.    A final agency action, like the Final Rule at issue here, shall be held "unlawful and set aside" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

147.    In other words, a rule must not be deficient in its basis, its reach, its considerations, its explanations, its plausibility, or its treatment of similar cases. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987); *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996); *Northport Health Servs. of Ark., LLC v. U.S. Dep't of Health & Hum. Servs.*, 14 F.4th 856, 873 (8th Cir. 2021).

148.    The Final Rule is deficient in many of these respects.

149.    The Final Rule arbitrarily and capriciously reaches waters with no relevant connection to navigable waters of the United States.  The Final Rule extends to intermittent, ephemeral, and perennial streams.  It can extend to intrastate, isolated waterbodies with no actual hydrological connection to navigable-in-fact waters.  It can extend to lands that contain moisture and exist within some undefined proximity to other water features.  It can extend to dry channels

and the like that only formerly contained water.  It can extend to impoundments that contain waters that formerly constituted WOTUS but no longer bear any connection to navigable waters.

150.    The Agencies provided no valid justification for extending their understanding of WOTUS so broadly and indiscriminately.  For example, although the Final Rule frequently cites to the Agencies' 2015 Science Report and similar publications, it also disclaims strict reliance on the Science Report or any other part of "the science" in construing the scope of the CWA.  The Agencies also offered a contradictory and implausible discussion of their engagement with relevant Supreme Court precedent.  Although the Agencies repeatedly insisted that the Final Rule was "informed" by "Supreme Court case law," *see*, *e.g.*, 88 Fed. Reg. at 3020, they simultaneously insisted that the Final Rule was not "an application of the Supreme Court's principles to derive a governing rule of law," *id.* at 3021.  Thus, the Agencies appear to have read the relevant Supreme Court precedents, yet employed only those they found helpful, and even those only in an undefined way.  Cherry-picking preferred parts of precedent does not reflect reasoned decision-making.  And the Agencies cited their own generalized experience in applying prior iterations of the statute without explaining how that experience helps decide the question of what the *statute* intended when it greenlit regulating "navigable" "waters of the United States."

151.    The Agencies also acted arbitrarily and capriciously in refusing to offer concrete standards or guidelines for determining when a water is a jurisdictional water, other than vague qualitative norms to be applied on a case-by-case basis.  This nebulous approach ensures that similar parcels and waters will be treated inconsistently as different evaluators undertake jurisdictional assessments.  The ambiguity further invites protracted administrative proceedings and potential litigation, imposing needless burdens on States and regulated parties.

152.    Next, the Agencies engaged in a flawed cost-benefit analysis that concluded that the Final Rule would result in only "*de minimis* costs" generally, 88 Fed. Reg. at 3007, and somehow would produce *no* "new costs or other requirements [as to] states," *id.* at 3141.

153.    At bottom, the Agencies reached this conclusion by assuming that the Final Rule was consistent with the pre-2015 enforcement regime that was reinstated immediately before the Final Rule's promulgation.  Working from this mistaken belief, the Agencies contradictorily concluded that any "increase in waters being found to be jurisdictional under the final rule in comparison to the pre-2015 regulatory regime" would be "unquantifiable" but "slight."  U.S. Env't Prot. Agency & U.S. Army Corps of Eng'rs, Revised Definition of "Waters of the United States": Response to Comments Document, Section 5 – Rulemaking Process and Other Statutes' Requirements 38 (2022) ("Comments Response"), *available at* https://bit.ly/3RYgkko; *but see id.*, Section 17 – Economic Analysis, at 14, *available at* https://bit.ly/3xmBWNT ("The agencies acknowledge that changes to the definition of 'waters of the United States' inevitably have a cost to states.").

154.    Yet in the many ways as explained above, the Final Rule extends further than the pre-2015 regulatory framework, so additional costs are certain to be more than "de minimis."  As to the States, for example, increased permitting and enforcement costs are inevitable.  The Agencies should have, at the very least, *attempted* to measure these costs.  They did not.

155.    In doing so, the Agencies further ignored or unreasonably minimized the many specific costs and consequences identified in the many comments that recommended scrapping the Final Rule, including compliance, mitigation, and in-lieu-fee costs.  Indeed, the Agencies outright refused to address costs to small businesses (many of which were expressly identified in public

comments) despite their statutory obligation to do so.  88 Fed. Reg. at 3139.  At the same time, the Agencies overestimated purported benefits of the Final Rule.

156.    Moreover, the Agencies treated the purpose to which potentially covered waters will be put in an inconsistent and contradictory way.  For example, the Agencies excluded certain "artificial reflecting or swimming pools or other small ornamental bodies of water" from the definition of jurisdictional waters. 88 Fed. Reg. at 3111.  Similarly, the Agencies excluded certain "waterfilled depressions created incidental to construction activity."  *Id.*; *see also id.* at 3144 (excluding certain "lakes or ponds" that are "used exclusively for such purposes as stock watering, irrigation, settling basins, or rice growing").  Other than noting that the Agencies have applied them in prior iterations of CWA regulations, the Agencies do not explain why such purpose-based exclusions are appropriate.  Yet excepting these and a few other minor exclusions, outside of navigable-in-fact waters, the Agencies arbitrarily failed to consider a water's purpose when classifying it as a water of the United States.  So a channel used in agricultural operations, for example, could be deemed a covered water even though it serves the same purpose as those waters described in the very narrow purpose-based exclusions.

157.    Likewise, the Agencies offered a contradictory and implausible discussion of the assumed benefits of federal jurisdiction.  Through the Final Rule, the Agencies assumed that the maximum lawful degree of federal jurisdiction was the preferred outcome.  State and local rules are most often treated by the Agencies as insufficient or beside the point; for instance, the Agencies criticize States for not immediately passing additional water-management laws during the brief year that the NWPR was implemented.  88 Fed. Reg. at 3065.  At the same time, however, the Agencies are forced to acknowledge "that a lack of federal jurisdiction does not necessarily mean that a water body is completely unprotected."  Comments Response, *supra*, SECTION 2 – LEGAL

ARGUMENTS," at 23 (2022), *available at* https://bit.ly/3I3GCNP.  And beyond that, the Agencies do not articulate why a reduction of regulation will in every case lead to an undesirable degradation of water resources that is inconsistent with the broader objectives of the CWA.  Lacking coherency and reasoning, the Final Rule's treatment of state regulation is arbitrary and capricious.

158.    The Final Rule's treatment of "environmental justice" is arbitrary and capricious, too.  According to the Agencies themselves, "impacts on communities with environmental justice concerns are not a basis for determining the scope of the definition of 'waters of the United States.'"  88 Fed. Reg. at 3018.  Even so, the Agencies determined to revise or replace the NWPR's construction of "waters of the United States" in part because of "environmental justice" concerns.  *Id.* at 3018, 3142.  Thus, by the Agencies' own admission, they have rejected a potential alternative to the Final Rule because of "factors which Congress has not intended [the Agencies] to consider."  *In re Operation of Missouri River Sys. Litig.*, 421 F.3d 618, 628 (8th Cir. 2005).

159.    For these and other reasons, the Court should deem the Final Rule unlawful and set it aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## COUNT THREE

### Violation of the Administrative Procedure Act
### Without Observance of Procedure Required by Law
### (5 U.S.C. § 706(2)(D))

160.    The Plaintiff States incorporate the preceding paragraphs by reference.

161.    A final agency action, like the Final Rule at issue here, shall be held "unlawful and set aside" if found to be "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  In other words, it is not enough for a rule to be substantively sound—the process by which it was promulgated must also be proper.

162.    The APA provides that before an agency conducts a "rulemaking," it must provide a "[g]eneral notice of proposed rule-making" and give "interested persons an opportunity to participate in the rule-making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c).  A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... without observance of procedure required by law."  *Id.* § 706(2)(D).

163.    If a final rule is not the "logical outgrowth" of the proposed rule, the rule is invalid. *Long Island Care At Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007).  The object of the test is to provide adequate notice and opportunity to comment.  *See Citizens Telecomm. Co. of Minnesota, LLC v. Fed. Commc'ns Comm'n,* 901 F.3d 991, 1005 n.11 (8th Cir. 2018) (finding no meaningful difference between fair notice inquiry and "logical outgrowth" approach).

164.    The Final Rule does not satisfy the logical outgrowth test because the Proposed Rule did not give interested parties sufficient notice in several ways.  For one, the Agencies did not signal that they intended to redefine "significant nexus" to embrace any water that might have a "material influence" on jurisdictional waters.  States and other parties were thus deprived of the opportunity to comment on the apparently lowered standard that the Agencies unilaterally adopted.

165.    The Final Rule also does not satisfy the logical outgrowth test because it did not signal that the Agencies intended to expand the reach of "adjacency."  Although the Agencies purported to retain a definition focused on "bordering, contiguous, or neighboring" waters, they also adopted a new approach in the Final Rule that focuses on the collective "mosaic" of wetlands in a given region.

166.    Lastly, the Final Rule does not satisfy the logical outgrowth test because it created a new standard for Approved Jurisdictional Determinations issued under the NWPR.  The Proposed Rule did not say anything about how the Agencies might treat prior determinations.

Because the Supreme Court has said that an adjudication finding no jurisdiction is "a five-year safe harbor from liability under the" CWA, *Hawkes*, 578 U.S. at 600 parties could have reasonably concluded from the face of the Proposed Rule that the Agencies' silence meant that existing determinations would continue to be respected.  The Final Rule, however, upsets that expectation.  Instead, the Agencies formalized prior informal agency communications (outside the Proposed Rule) showing that the Agencies will largely refuse to rely on NWPR-approved jurisdictional determinations going forward.  Thus, without warning in the Proposed Rule, the Agencies forced regulated parties to reassume expensive jurisdictional assessments for a second time.

167.    Apart from these and other logical outgrowth concerns, the Agencies also failed to meet their obligations under the Regulatory Flexibility Act of 1980 (RFA), *as amended*, 5 U.S.C. §§ 601-612.  They did not solicit or consider flexible regulatory proposals, and they did not undertake required cost-benefit analyses.  Instead, the Agencies mistakenly declared that they were excused from these obligations because the Final Rule "will not have a significant economic impact on a substantial number of small entities."  88 Fed. Reg. at 3139-40.

168.    The Agencies wrongly determined that no RFA analysis was needed because the Final Rule introduces only "de minimis differences" from the rule in place since the 2020 NWPR vacatur, while generally "narrow[ing] the scope of jurisdiction from the text of the 1986 regulations."  88 Fed. Reg. at 3139-40.  In fact, the Final Rule serves as a top-to-bottom expansion of the Agencies' authority closer to the now-defunct 2015 Rule than the 1986 Regulations.  The Agencies should have meaningfully analyzed those changes—but they did not.

169.    The Agencies also declared that the Final Rule "does not directly apply to specific entities."  88 Fed. Reg. at 3139.  But, of course, the Final Rule directly affects, among many others, the many landowners who now find themselves subject to federal jurisdiction, permitting

requirements, operations restrictions, and more.  Even the potential specter of federal jurisdiction provides enough reason to say that the Final Rule "applies" to parties; those parties who *may* be within the Final Rule's grasp will still need to undertake expensive assessments, forego their activities on the potentially covered property, or risk serious civil and criminal penalties.  The Supreme Court's decision in *Sackett*, for instance, confirms that these jurisdictional decisions have meaningful consequences for the parties they apply to, and a reasonable agency would account for those consequences.  132 S. Ct. at 1367.  The Agencies unreasonably blinded themselves to the consequences of their actions to justify foregoing a proper RFA analysis.

170.    For these and other reasons, the Court should deem the Final Rule unlawful and set it aside for being promulgated "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

## COUNT FOUR

### Violation of the Administrative Procedure Act and the Commerce Clause
### (5 U.S.C. § 706(2)(B); U.S. CONST. art. I, § 8)

171.    The Plaintiff States incorporate the preceding paragraphs by reference.

172.    A final agency action, like the Final Rule at issue here, shall be held "unlawful and set aside" if it is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  In other words, a rule cannot extend beyond what is constitutionally permissible.  The Final Rule does just that.

173.    The Constitution grants to Congress the power "to regulate commerce with foreign nations, and among the several states."  U.S. CONST. art. I, § 8.  Congress has power over the "channels of interstate commerce," power to "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce," and power over "activities

having a substantial relation to interstate commerce," which means those that "substantially affect interstate commerce." *United States v. Morrison*, 529 U.S. 598, 608-09 (2000) (cleaned up).

174.    In the context of the Clean Water Act, Congress's authority over "waters of the United States" is tethered to navigable channels of interstate commerce. *SWANCC*, 531 U.S. at 172.  Congress's use of the word "navigable" indicates "what Congress had in mind as its authority for enacting the CWA: Its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Id.*

175.    Here, the Final Rule reaches land and waters without requiring that they bear a direct connection to navigable waters or otherwise bear some substantial relationship with (or otherwise substantially affect) interstate commerce.  For example, the Final Rule removes portions of the 1986 Regulations that spoke directly to interstate commerce, replacing that category with the catch-all "other waters" category that does not carry with it any meaningful connection with commerce.  It did so even though "Clean Water Act jurisdiction is not co-extensive with Congress' Commerce Clause authority." *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 183 (D.D.C. 2008).

176.    The Final Rule also embraces subsurface waters in many different circumstances. Yet "as to groundwater pollution and nonpoint source pollution, Congress intended to leave substantial responsibility and autonomy to the States." *Cnty. of Maui*, 140 S. Ct. at 1471.

177.    For these and other reasons, the Court should deem the Final Rule unlawful and set it aside as "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), as established by the Commerce Clause, U.S. CONST. art. I, § 8.

**COUNT FIVE**

**Violation of the Administrative Procedure Act and the Due Process Clause**
**(5 U.S.C. § 706(2)(B); U.S. CONST. amend. V)**

178.    The Plaintiff States incorporate the preceding paragraphs by reference.

179.    A final agency action, like the Final Rule at issue here, shall be held "unlawful and set aside" if it is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  In other words, a rule cannot extend beyond what is constitutionally permissible.

180.    A statute or regulation that imposes penalties for non-compliance violates the Due Process Clause of the Fifth Amendment where it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Const. Co*, 269 U.S. 385, 391 (1926).

181.    The Clean Water Act, and by extension the Final Rule, directly implicates these due-process concerns.  "It is often difficult to determine whether a particular piece of property contains waters of the United States, but there are important consequences if it does." *Hawkes*, 578 U.S. at 594.  Most relevant here, the CWA imposes tens of thousands of dollars of civil penalties, and further potential criminal penalties, for individuals who discharge or dredge in "waters of the United States."  33 U.S.C. § 1319; *Hawkes*, 578 U.S. at 600.

182.    At the same time, the Final Rule is irretrievably vague.  It nests ambiguous and undefined terms into tests and standards that themselves offer no clear guidance how to balance the relevant factors.  The vague terms abound, including "adjacent," "certain times of year," "interstate waters," "impoundments," "material influence," "mosaic," "relatively permanent," "seasonally," "significantly affect," "significant nexus," "similarly situated," and "tributaries."

183.    Qualitative standards and bright-line rules are almost totally absent.  Even where the Agencies purport to create actual standards, they often invoke their ill-defined "experience"

with previous iterations of WOTUS regulations or guidance and say that this experience will inform their decision-making—in unspecified ways. *See*, *e.g.*, 88 Fed. Reg. at 3127.

184.    Further, the Final Rule expressly declines to provide definite standards for several important aspects of the jurisdictional test, encouraging arbitrary and discriminatory treatment by way of an ill-defined "case-by-case" approach to enforcement. *See*, *e.g.*, 88 Fed. Reg. at 3103. The ambiguities of the rule guarantee that application will vary wildly from one jurisdictional determination to another.

185.    All together, the Final Rule does not give fair notice of what waters are subject to the reach of the Clean Water Act, and thus when unpermitted activities involving waters might carry substantial civil or criminal penalties.  In other words, the Final Rule's vagueness prevents ordinary people from understanding when the CWA even applies, and "most laws do not require the hiring of expert consultants to determine if they even apply to you or your property." *Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 1003 (8th Cir. 2015) (Kelly, J., concurring).

186.    For these and other reasons, the Court should deem the Final Rule unlawful and set it aside as "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), as established by Due Process Clause, U.S. CONST. amend. V.

## COUNT SIX

### Violation of the Administrative Procedure Act and the Tenth Amendment
### (5 U.S.C. § 706(2)(B); U.S. CONST. amend. X)

187.    The Plaintiff States incorporate the preceding paragraphs by reference.

188.    A final agency action, like the Final Rule at issue here, shall be held "unlawful and set aside" if it is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  In other words, a rule cannot extend beyond what is constitutionally permissible.

189.    The Tenth Amendment to the United States Constitution requires that "[t]he powers not delegated to the United States by the Constitution ... are reserved to the States respectively, or the people." U.S. CONST., amend. X.  In short, the federal government can only exercise powers expressly granted to it by the Constitution.  *See New York v. United States*, 505 U.S. 144, 155 (1992); *Printz v. United States*, 521 U.S. 898, 919 (1997).  Although certain legislative powers were granted to Congress, "they are not unlimited."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018).

190.    Among the rights and powers reserved to the States under the Tenth Amendment is the authority to regulate intrastate land use and water resources.  *SWANCC*, 531 U.S. at 174 (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) ("[R]egulation of land use [is] a function traditionally performed by local governments.")).

191.    In the CWA, Congress expressly honored this constitutionally mandated primacy of the States over intrastate waters and lands.

192.    By adopting the Final Rule, the Agencies violated the States' Tenth Amendment rights, as recognized by the CWA, by asserting jurisdiction over extremely wide swaths of intrastate waters and lands.  Federal standards will now become the necessary floor for environmental regulation in a host of new contexts, with state authority relegated to a secondary, supplemental status.

193.    For these and other reasons, the Court should deem the Final Rule unlawful and set it aside as "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), as established by the Tenth Amendment, U.S. CONST. amend. X.

## COUNT SEVEN

### Declaratory Judgment
### (28 U.S.C. § 2201)

194.   The Plaintiff States incorporate the preceding paragraphs by reference.

195.   There is an actual controversy of sufficient immediacy and concreteness relating to the legal rights and duties of the Plaintiff States and their legal relations with the Defendants to warrant relief under 28 U.S.C. § 2201.   In particular, the parties profoundly disagree over the legality of the Final Rule and the proper construction of "waters of the United States" in the CWA.

196.   The harm to the Plaintiff States as a direct result of the Final Rule is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal duties of the parties.  Among other things, without a declaration, the States and regulated parties will be forced to undertake compliance activities that will prove unnecessary if it is later determined that the Final Rule was not lawfully promulgated.

197.   For the reasons explained above, the Court should grant the Plaintiff States a declaration that the Final Rule is unlawful under the Constitution, the Clean Water Act, the Administrative Procedures Act, and other provisions of law identified here.

### PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff States respectfully request that the Court:

A.   Declare the Final Rule to be in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C), and the Clean Water Act, 33 U.S.C. § 1251-1387, for exceeding the Agencies' statutory authority;

B.   Declare the Final Rule to be in violation of the Administrative Procedure Act 5 U.S.C. § 706(2)(A), for lacking essential findings and imposing arbitrary standards;

C.      Declare the Final Rule to be in violation of the Administrative Procedure Act 5

U.S.C. § 706(2)(D), for failing to conduct required analyses and failing to provide adequate notice

in the Proposed Rule;

D.      Declare the Final Rule to be in violation of the Administrative Procedure Act 5

U.S.C. § 706(2)(B), by offending the Commerce Clause, U.S. CONST. art. I, § 8, Due Process

Clause, U.S. CONST. amend. V, and the Tenth Amendment, U.S. CONST. amend. X;

E.      Hold, vacate, and set aside the Final Rule as unlawful;

F.      Enjoin Defendants and any other agency or employee acting on behalf of the United

States from using, applying, implementing, enforcing, or otherwise proceeding on the basis of the

Final Rule;

G.      Remand the matter to the Agencies with instructions to issue a rule that complies

with the Constitution, the statutory limits and cooperative-federalism mandate of the Clean Water

Act, the procedural mandates of the Regulatory Flexibility Act, and the Administrative Procedure

Act;

H.      Award Plaintiff States their reasonable attorney fees and costs; and

I.      Grant the Plaintiff States such other relief as may be necessary and appropriate or

as the Court deems just and proper.


Respectfully submitted,

PATRICK MORRISEY                            DREW H. WRIGLEY
Attorney General of West Virginia           Attorney General of North Dakota

/s/ Michael R. Williams                     /s/ Margaret I. Olson
Lindsay See                                 Margaret I. Olson – State Bar ID No. 06352
  Solicitor General                         Jennifer L. Verleger – State Bar ID No. 06732
Michael R. Williams                           Assistant Attorneys General
  Senior Deputy Solicitor General
                                            Office of Attorney General
Office of the West Virginia Attorney General 500 N. 9th Street

State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for State of West Virginia*

Bismarck, ND 58501
Phone: (701) 328-3640
dwrigley@nd.gov
jverleger@nd.gov
maiolson@nd.gov

*Counsel for State of North Dakota*

CHRISTOPHER M. CARR
Attorney General of Georgia

/s/ Stephen J. Petrany
Stephen J. Petrany*
  Solicitor General

Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

BRENNA BIRD
Attorney General of Iowa

/s/ Eric H. Wessan
Eric H. Wessan*
  Solicitor General

1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

STEVE MARSHALL
Attorney General of Alabama

Edmund G. LaCour Jr.* (ASB-9182-U81L)
  Solicitor General

Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for State of Alabama*

TREG TAYLOR
Attorney General of Alaska

David A. Wilkinson*
  Senior Assistant Attorney General

1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5100
david.wilkinson@alaska.gov

*Counsel for State of Alaska*

TIM GRIFFIN
Attorney General of Arkansas

ASHLEY MOODY
Attorney General of Florida

Nicholas J. Bronni*
  Solicitor General
Dylan L. Jacobs*
  Deputy Solicitor General

Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for State of Arkansas*


THEODORE E. ROKITA
Attorney General of Indiana

Thomas M. Fisher*
  Solicitor General

Indiana Attorney General's Office
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
(317) 232-6255
tom.fisher@atg.in.gov

*Counsel for State of Indiana*


JEFF LANDRY
Attorney General of Louisiana

Elizabeth B. Murrill*
  Solicitor General
J. Scott St. John
  Deputy Solicitor General
Tracy Short
  Assistant Attorney General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov

Natalie P. Christmas* (Fla. Bar 1019180)
Assistant Attorney General of Legal Policy

Florida Attorney General's Office
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)

natalie.christmas@myfloridalegal.com

*Counsel for State of Florida*


KRIS KOBACH
Attorney General of Kansas

Jesse A. Burris
  Assistant Attorney General

Kansas Attorney General's Office
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for State of Kansas*


LYNN FITCH
Attorney General of Mississippi

Justin L. Matheny* (MS Bar No. 100754)
  Deputy Solicitor General

Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Fax: (601) 359-2003
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

stjohnj@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for State of Louisiana*


ANDREW BAILEY
Attorney General of Missouri

Joshua M. Divine, Mo. Bar No. 69875*
  Solicitor General
Jeff P. Johnson, Mo. Bar No. 73249*
  Deputy Solicitor General

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
Josh.divine@ago.mo.gov

*Counsel for State of Missouri*

MICHAEL T. HILGERS
Attorney General of Nebraska

Eric J. Hamilton*
  Deputy Solicitor General

Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Eric.Hamilton@nebraska.gov

*Counsel for State of Nebraska*


DAVE YOST
Attorney General of Ohio

Benjamin M. Flowers*
  Ohio Solicitor General


AUSTIN KNUDSEN
Attorney General of Montana

Christian B. Corrigan*
  Solicitor General
Brent Mead*
  Deputy Solicitor General

Office of the Montana Attorney General
215 N Sanders St
Helena, MT 59601
(406) 444-2707
Christian.Corrigan@mt.gov

*Counsel for State of Montana*

JOHN M. FORMELLA
Attorney General of New Hampshire

Anthony J. Galdieri*
  Solicitor General

Brandon F. Chase*
  Assistant Attorney General

New Hampshire Department of Justice
33 Capitol Street
Concord, NH  03301
(603) 271-3650
brandon.f.chase@doj.nh.gov

*Counsel for State of New Hampshire*


GENTNER F. DRUMMOND
Attorney General of Oklahoma

Garry M. Gaskins, II*
  Solicitor General

30 E. Broad St., 17th Floor
Columbus, OH 43215
Phone:  614.466-8980
bflowers@ohioago.gov

*Counsel for State of Ohio*

Zach West*
  Director of Special Litigation
Jennifer L. Lewis*
  Assistant Attorney General

313 N.E. 21st Street
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.gaskins@oag.ok.gov
Zach.west@oag.ok.gov
Jennifer.lewis@oag.ok.gov

*Counsel for State of Oklahoma*

ALAN WILSON
Attorney General of South Carolina

J. Emory Smith, Jr.
  Deputy Solicitor General

Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Phone:  (803) 734-3680; Fax:  (803) 734-3677
Email:   ESmith@scag.gov

*Counsel for State of South Carolina*

MARTY J. JACKLEY
Attorney General of South Dakota

Charles D. McGuigan*
  Deputy Attorney General Civil Division

1302 E. Highway 14, Suite 1
Pierre, SD 57501
605-773-3215
atgservice@state.sd.us

*Counsel for State of South Dakota*

JONATHAN SKRMETTI
Attorney General and Reporter
of the State of Tennessee

Andreé Blumstein
  Solicitor General
Clark L. Hildabrand*
  Assistant Solicitor General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for State of Tennessee*

SEAN REYES
Attorney General of Utah

Melissa Holyoak*
Solicitor General

Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for State of Utah*

JASON MIYARES
Attorney General of Virginia

Andrew N. Ferguson*
  Solicitor General
Kevin M. Gallagher*
  Deputy Solicitor General
M. Jordan Minot*
  Assistant Solicitor General

Virginia Attorney General's Office
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us
mminot@oag.state.va.us

*Counsel for State of Virginia*

BRIDGET HILL
Attorney General of Wyoming

Travis Jordan (ND Bar No. 08933)
  Senior Assistant Attorney General

Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
travis.jordan@wyo.gov

*Counsel for State of Wyoming*

*application for admission or motion for *pro hac vice* forthcoming