## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## EASTERN DIVISION

| | |
|---|---|
| **STATES OF WEST VIRGINIA**, **NORTH DAKOTA**, **GEORGIA**, and **IOWA**, *et al.*, | |
| Plaintiffs, | Case No. 3:23-cv-00032-PDW-ARS |
| v. | Hon. Peter D. Welte |
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**, e*t al.*, | |
| Defendants. | |

## PLAINTIFF STATES' MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ...................................................................................................... 2

ARGUMENT .......................................................................................................... 7

   I.     The States Are Likely To Succeed On The Merits Of Their Claims ................................... 7

       A.     The Agencies Have Acted Beyond Their Statutory Authority .................................. 8

       B.     The Agencies Arbitrarily And Capriciously Adopted The Final Rule .................... 15

       C.     The Agencies Did Not Comply With Important Procedural Requirements ............ 16

       D.     The Agencies Have Violated the Constitution......................................................... 19

   II.    The Remaining Preliminary Injunction Factors Favor The States.................................... 21

       A.     The Final Rule Will Irreparably Harm The States .................................................. 21

       B.     The Balance Of Harms And The Public Interest Support An Injunction ............... 24

CONCLUSION........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935)...................................................................................14

*Akiachak Native Cmty. v. Jewell*,
   995 F.Supp.2d 7 (D.D.C. 2014)....................................................................21

*Almendarez-Torres v. United States*,
   523 U.S. 224 (1998)...................................................................................14

*Am. Petroleum Inst. v. Johnson*,
   541 F. Supp. 2d 165 (D.D.C. 2008)..............................................................20

*Assoc. Gas Distribs. v. FERC*,
   893 F.2d 349 (D.C. Cir. 1989).....................................................................15

*Bond v. United States*,
   572 U.S. 844 (2014)...................................................................................12

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988)...................................................................................23

*Brady v. Nat'l Football League*,
   640 F.3d 785 (8th Cir. 2011) .........................................................................7

*Brown v. Gardner*,
   513 U.S. 115 (1994).....................................................................................8

*California v. United States*,
   438 U.S. 645 (1978)................................................................................2, 13

*Carr v. United States*,
   560 U.S. 438 (2010)...................................................................................10

*Connally v. Gen. Const. Co*,
   269 U.S. 385 (1926)...................................................................................21

*CSX Transp., Inc. v. Surface Transp. Bd.*,
   584 F.3d 1076 (D.C. Cir. 2009)...................................................................18

*Dataphase Systems, Inc. v. C.L. Systems, Inc.*,
   640 F.2d 109 (8th Cir. 1981) .........................................................................7

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*In re EPA*,
    803 F.3d 804 (6th Cir. 2015) ................................................................25

*FEC v. Cruz*,
    142 S. Ct. 1638 (2022) .......................................................................8

*FERC v. Mississippi*,
    456 U.S. 742 (1982) ..........................................................................2

*FTC v. Atl. Richfield Co.*,
    567 F.2d 96 (D.C. Cir. 1977) ...............................................................15

*Georgia v. Pruitt*,
    326 F. Supp. 3d 1356 (S.D. Ga. 2018) ....................................21, 22, 23, 24

*Georgia v. Wheeler*,
    418 F. Supp. 3d 1336 (S.D. Ga. 2019) ..........................3, 5, 9, 11, 18

*Goldberg v. Wade Lahar Const. Co.*,
    290 F.2d 408 (8th Cir. 1961) ...............................................................19

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ..........................................................................12

*Hudson Cnty. Water Co. v. McCarter*,
    209 U.S. 349 (1908) ..........................................................................22

*Iowa Utils. Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996) .......................................................21, 23

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
    513 U.S. 527 (1995) ..........................................................................15

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ...........................................................21

*LeMoyne-Owen Coll. v. NLRB*,
    357 F.3d 55 (D.C. Cir. 2004) ...............................................................15

*Mistretta v. United States*,
    488 U.S. 361 (1989) ..........................................................................14

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*New York v. United States*,
   505 U.S. 144 (1992)...............................................................................................20

*Nken v. Holder*,
   556 U.S. 418 (2009)...............................................................................................24

*North Dakota v. EPA*,
   127 F. Supp. 3d 1047 (D.N.D. 2015)...........................................5, 7, 11, 18, 22, 23, 24

*Northport Health Servs. of Ark., LLC v. U.S. Dep't of Health & Hum. Servs.*,
   14 F.4th 856 (8th Cir. 2021) ...................................................................................17

*Pascua Yaqui Tribe v. EPA*,
   557 F. Supp. 3d 949 (D. Ariz. 2021) ..........................................................................5

*PCTV Gold, Inc. v. SpeedNet*,
   LLC, 508 F.3d 1137 (8th Cir. 2007)............................................................................7

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
   530 F.3d 724 (8th Cir. 2008) ....................................................................................7

*POM Wonderful LLC v. Coca-Cola Co.*,
   573 U.S. 102 (2014).................................................................................................8

*Rapanos v. United States*,
   547 U.S. 715 (2006)........................................................................................4, 8, 11

*S.D. Warren Co. v. Me. Bd. of Env't Prot.*,
   547 U.S. 370 (2006).................................................................................................2

*Sackett v. EPA*,
   566 U.S. 120 (2012)...............................................................................................14

*Sackett v. EPA*,
   8 F.4th 1075 (9th Cir. 2021) .....................................................................................6

*Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs*,
   531 U.S. 159 (2001)..............................................3, 4, 8, 9, 11, 12, 13, 19, 20, 22

*Tarrant Reg'l Water Dist. v. Herrmann*,
   569 U.S. 614 (2013)...............................................................................................22

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Texas v. EPA,*
  389 F. Supp. 3d 497 (S.D. Tex. 2019) .................................................................18

*Texas v. EPA,*
  No. 3:15-cv-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018).......................24

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
  578 U.S. 590 (2016).........................................................................................3, 21

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,*
  140 S. Ct. 1837 (2020)........................................................................................12

*Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec.,*
  738 F.3d 885 (8th Cir. 2013) ...............................................................................14

*United States v. Brennan,*
  452 F. Supp. 3d 225 (E.D. Pa. 2020) ...................................................................10

*United States v. Morrison,*
  529 U.S. 598 (2000)............................................................................................19

*United States v. Riverside Bayview Homes, Inc.,*
  474 U.S. 121 (1985)..........................................................................................4, 8

*Univ. of Texas v. Camenisch,*
  451 U.S. 390 (1981)............................................................................................25

*W. Plains, LLC v. Retzlaff Grain Co. Inc.,*
  870 F.3d 774 (8th Cir. 2017) ...............................................................................25

*Weather Modification LLC v. Brackin,*
  No. 3:20-cv-73, 2020 WL 4606843 (D.N.D. June 12, 2020) ...................................7

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022).........................................................................................13

*Will v. Mich. Dep't of State Police,*
  491 U.S. 58 (1989)..............................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008).............................................................................................7, 24

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

**Constitutional Provisions**

U.S. CONST. amend. X ...................................................................20

U.S. CONST. art. I, § 1 ..................................................................14

U.S. CONST. art. I, § 8 ..................................................................19

**Statutes**

5 U.S.C. § 604...............................................................................17

5 U.S.C. § 706..............................................................8, 15, 16, 19

33 U.S.C. § 1251........................................................................2, 13

33 U.S.C. § 1311.............................................................................3

33 U.S.C. § 1319.........................................................................3, 21

33 U.S.C. § 1342.............................................................................3

33 U.S.C. § 1344.............................................................................3

33 U.S.C. § 1362.........................................................................2, 8

33 U.S.C. § 1365.............................................................................3

**Regulations**

33 C.F.R. § 328.3 (2015) .................................................................5

40 C.F.R. § 19.4 .............................................................................3

40 C.F.R. § 230.3 (2015) .................................................................5

85 Fed. Reg. 22250 (Apr. 21, 2020) ................................................5

86 Fed. Reg 69372 (Dec. 7, 2021) ...................................................6

88 Fed. Reg. 3004 (Jan. 18, 2023) ..........................1, 6, 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, 23, 25

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

**Other Authorities**

Donald Worster, *Watershed Democracy: Recovering the Lost Vision of John
Wesley Powell*, 23 J. LAND RES. & ENV'T L. 57 (2003) ..........................................................19

Paul J. Larkin, *The Clean Water Act and the Void-for-Vagueness Doctrine*,
20 GEO. J.L. & PUB. POL'Y 639 (2022)...................................................................................21

Sean G. Herman, *A Clean Water Act, If You Can Keep It*,
13 GOLDEN GATE U. ENV'T L.J. 63 (2021)..............................................................................15

U.S. ENV'T PROT. AGENCY & U.S. ARMY CORPS OF ENG'RS, CLEAN WATER ACT
JURISDICTION FOLLOWING THE U.S. SUPREME COURT'S DECISION IN *RAPANOS
V. UNITED STATES* & *CARABELL V. UNITED STATES* (Dec. 2, 2008) ...........................................4, 5

U.S. ENV'T PROT. AGENCY & U.S. ARMY CORPS OF ENG'RS, REVISED DEFINITION
OF "WATERS OF THE UNITED STATES": RESPONSE TO COMMENTS DOCUMENT,
SECTION 5 – RULEMAKING PROCESS AND OTHER STATUTES' REQUIREMENTS
(2022).........................................................................................................................................16

## INTRODUCTION

The Clean Water Act, one of the country's most important environmental laws, has also created one of the stickiest questions of agency authority:  Where did Congress draw the line between "waters of the United States" subject to federal jurisdiction and the land and water resources under the States' protection?   After several federal courts rejected expansive jurisdictional theories from the enforcing agencies, those agencies deployed a different sales pitch for the Final Rule at issue now.  Nothing to see here, they say; this rule just reinstates a well-settled definition from the era before their ill-fated jurisdictional grab in 2015.  *See* 88 Fed. Reg. 3004 (Jan. 18, 2023).  But that story is false.

In all the ways that matter, the Final Rule is the 2015 Rule repackaged.  Its expansive standards deploy amorphous tests to place under federal control most any water (or land, or intermittent moisture) so long as a loose connection can conceivably tie it to navigable-in-fact or interstate waters.  Where the 2015 Rule claimed jurisdiction across a 100-year floodplain, for instance, the Final Rule looks to a "wetland mosaic" in an undefined but similarly expansive region.  88 Fed. Reg. at 3093.  The result is the same: maximum enforcement discretion for the agencies, and little-to-no notice or certainty of what falls within "waters of the United States" for the States and regulated parties.

The States will show that, like the 2015 Rule, this latest attempt is illegal.  It goes beyond the power Congress delegated in the CWA, raises serious constitutional concerns, and runs roughshod over the Administrative Procedure Act.  The States need preliminary relief from all this now, before the Final Rule takes effect on March 20.  That date will trigger significant burdens for the States, who administer costly and time-intensive permitting and other programs under the CWA.  The time and money to dissect the Final Rule and expand these programs to match the

rule's expanded coverage will cut against other critical state functions and can never be recovered. If nothing else, the Court should maintain the status quo until the Supreme Court issues its decision in a pending case that is poised to clarify many of the key questions in this one.

This Court should preliminarily enjoin the Final Rule, just as it did the 2015 Rule.

## BACKGROUND

**1.** Congress wrote cooperative federalism into the CWA's center. At the same time that Congress crafted the statute's federal programs to "restore and maintain … the Nation's waters," it "recognize[d], preserve[d], and protect[ed]" the States' "primary responsibilities and rights" over their "land and water resources." 33 U.S.C. § 1251(b). This partnership makes sense: the States' authority to regulate intrastate lands and waters "is perhaps *the* quintessential state activity," *FERC v. Mississippi*, 456 U.S. 742, 767 n.30 (1982) (emphasis added), and is as old as the Republic itself. Even if Congress could erode this traditional authority, it emphatically did not in the CWA. Instead, it followed its usual practice of "purposeful and continued deference to state water law." *California v. United States*, 438 U.S. 645, 653 (1978). Nothing in the CWA alters the baseline rule that waters within a State's borders are that "State's legitimate legislative business." *S.D. Warren Co. v. Me. Bd. of Env't Prot.*, 547 U.S. 370, 386 (2006).

By contrast, the Agencies here—the Environmental Protection Agency and the Army Corps of Engineers—can regulate water resources only with statutory authorization and only so far as those enabling statutes reach. Yet most everyone has remained confused over the years on that second point. The CWA makes clear that only *some* of the country's waters are subject to federal jurisdiction: "navigable waters," defined by Congress as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7), (12). Given Congress's limited enumerated powers and its textual commitment to uphold the States' traditional water-management rights, the

phrase "waters of the United States," or WOTUS, has limits.  It does not encompass all *inter*state waters, much less the majority of *intra*state waters.  *E.g.*, *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1360 (S.D. Ga. 2019) (an attempt to include all interstate waters as WOTUS "extends beyond [the Agencies'] authority under the CWA").  Wherever WOTUS's precise boundaries lie, one thing is clear: the States have jurisdiction over sizable portions of the Nation's water resources.

Where that line falls is serious business—not just for the States, but for homeowners, farms, and other businesses, too.  Discharging a traditionally understood contaminant (or even rocks and sand) from a point source into WOTUS, 33 U.S.C. §§ 1311(a), 1342; or dredging or filling material from or to WOTUS, *id.* § 1344; requires a federal permit that can take years and upward of six figures to secure.  *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 594-95 (2016) (an "average applicant" for certain permits "spends 788 days and $271,596").  The States have major obligations under these permitting programs, and must enact and revise certain CWA-required water quality standards along the way.  Regulated parties face steep costs for even inadvertent CWA violations.  Civil fines can top $60,000 per day and certain criminal violations can carry 15-year prison terms.  33 U.S.C. § 1319; 40 C.F.R. § 19.4.  The CWA also allows for "citizen suits" by anyone affected by an alleged violation of "an effluent standard or limitation"—including purported violations by a "governmental instrumentality or agency."  33 U.S.C. § 1365(a), (g).

Recognizing these weighty consequences, the Supreme Court has rebuked the Agencies for trying to sweep too many waters into the CWA's bucket before.  In 2001, for example, it shut down an attempt to reach "nonnavigable, isolated, intrastate waters" that migratory birds used as habitat.  *Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs*, 531 U.S. 159, 166, 171 (2001) (*SWANCC*).  Reading the CWA to invoke "the outer limits of Congress' power" like that

would raise "significant" constitutional questions and sanction "federal encroachment upon a traditional state power." *Id.* at 172-74.

Five years later, the Supreme Court rejected a jurisdictional grab for intrastate wetlands too far removed from navigable, interstate waters. *Rapanos v. United States*, 547 U.S. 715 (2006). Though five justices agreed on the outcome, they got there on different paths. A four-justice plurality held that only "relatively permanent, standing or continuously flowing bodies of water" and secondary waters with a "continuous surface connection" them are WOTUS; an "intermittent, physically remote hydrologic connection" is not enough. *Id.* at 739-42 (plurality op.). Writing for himself alone, Justice Kennedy thought the test turned on whether the disputed waters have a "significant nexus" to navigable waters, which meant it had a significant effect on their "chemical, physical, *and* biological integrity." *Id.* at 779-80 (Kennedy, J., concurring in the judgment) (emphasis added).

*Rapanos* was not the first time "significant nexus" appeared in WOTUS case law. In 1985, the Court had described a "significant nexus between … wetlands and navigable waters" in the sense that the "adjacent" wetlands were "inseparably bound up" with covered waters. *SWANCC*, 531 U.S. at 167-68 (cleaned up) (citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985)). Justice Kennedy's gloss was new to the extent he thought "significant nexus" reached more than waters close enough to navigable waters to be functionally inseparable from them. And even he admitted that some applications of his test may raise "federalism or Commerce Clause concerns." *Rapanos*, 547 U.S. at 782 (Kennedy, J., concurring in the judgment).

**2.** Since *Rapanos*, the Agencies issued non-binding guidance and now three rules. Their 2008 guidance claimed jurisdiction if *either* the *Rapanos* plurality or concurrence test applied. *See* U.S. Env't Prot. Agency & U.S. Army Corps of Eng'rs, Clean Water Act Jurisdiction

FOLLOWING THE U.S. SUPREME COURT'S DECISION IN *RAPANOS V. UNITED STATES* & *CARABELL V. UNITED STATES* 3 & n.16 (Dec. 2, 2008), *available at* https://bit.ly/3RXUs8E.  Yet its categories of "per se" jurisdiction largely tracked the plurality, focusing on "traditional navigable waters" and wetlands next to them ("adjacent" and "abut"), as well as non-navigable tributaries with "relatively permanent" flow.  *Id.* at 1.  It also claimed certain case-by-case jurisdiction, but only over waters a step more removed—like "not relatively permanent" tributaries and wetlands "adjacent" to them. *Id.*

In 2015, the Agencies issued a legally binding rule that went much further.  It covered all interstate waters, navigable or not, and any intrastate waters adjacent to them.  *See* 33 C.F.R. § 328.3(a)(2), (7) (2015); 40 C.F.R. § 230.3(o)(3)(i), (1)(vii) (2015).  It also reached all tributaries of certain "primary" waters, 33 C.F.R. § 328.3(c)(3) (2015); any waters "adjacent" to or merely "neighboring" those and other waters, 33 C.F.R. § 328.3(c)(1) (2015); 40 C.F.R. § 230.3(o)(3)(i) (2015); and all "similarly situated waters in the region" that may "significantly affect[]" a primary water's "chemical, physical, *or* biological integrity," 33 C.F.R. § 328.3(c)(5) (2015); 40 C.F.R. § 230.3(o)(3)(v) (2015) (emphasis added).  The 2015 Rule did not fare well.  This Court and two others preliminarily enjoined it as likely exceeding the Agencies' statutory authority and violating the Administrative Procedure Act.  *See North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015).  The rule was ultimately remanded to the Agencies for "read[ing] the term navigability out of the" statute.  *Georgia*, 418 F. Supp. 3d at 1358.

In 2020, the Agencies reined things in with a new Rule that adopted the *Rapanos* plurality's test alone.  *See* 85 Fed. Reg. 22250 (Apr. 21, 2020).  But eventually, a district court granted the Agencies' motion for voluntary remand and vacated the rule.  *See generally Pascua Yaqui Tribe v. EPA*, 557 F. Supp. 3d 949 (D. Ariz. 2021).

**3.**   The Final Rule at issue here reasserts the Agencies' sweeping view of federal jurisdiction.  The Agencies published their proposed rule in December 2021.  86 Fed. Reg 69372 (Dec. 7, 2021).  Not long after, the Supreme Court granted certiorari in *Sackett v. EPA*, 8 F.4th 1075 (9th Cir. 2021), *cert. granted*, 142 S. Ct. 896 (2022), a case that once again puts the definition of WOTUS squarely before the Court.  Even though the *Sackett* ruling is expected within the next four months, the Agencies finalized their proposal a few weeks ago, and set the Final Rule to take effect on March 20, 2023.  *See* 88 Fed. Reg. 3004 (Jan. 18, 2023).

With limited exceptions, the Final Rule reaches five categories of land and water: (1) traditional navigable waters, territorial seas, and interstate waters; (2) impoundments of WOTUS; (3) tributaries of waters in the first category that meet either *Rapanos* test; (4) wetlands adjacent to primary waters or many impoundments or tributaries; and (5) a catch-all bucket of other intrastate waters that meet either *Rapanos* test.  88 Fed. Reg. at 3142.

The Agencies packaged the Final Rule as one "founded on the familiar framework of the longstanding 1986 regulations," and the "familiar pre-2015 definition."  88 Fed. Reg. at 3005, 3007.  In reality, the rule uses illusory standards to capture a far broader category of land and water resources than advertised.  "Relatively permanent," for instance, now means the same as it did in the 2015 Rule.  *Id.* at 3084 ("flowing or standing water year-round or continuously during certain times of the year").  "Significant nexus" extends beyond Justice Kennedy's conception to rope in all waters in a "region" instead of only "adjacent" waters, and loosely define "significantly affect" as a "material influence" on navigable waters' "chemical, physical, or"—not "and"—"biological integrity."  *Id.* at 3067.  Tributaries are redefined to reach even dry places.  *Id.* at 3080.  The rule also manages to both broaden and muddy the already confusing concept of "adjacency"—when identifying covered wetlands, for example, it looks to all wetlands "collectively" in "a wetland

mosaic" across an undefined region that "generally act[s] as a single ecological unit." *Id.* at 3093. And the rule constructs a sweeping new category embracing all waters everywhere that, in the Agencies' view, satisfy the relatively-permanent or significant-nexus standards. *Id.* at 3097-98. None of this lingo tracks with the narrower pre-2015 regulations.

## ARGUMENT

The Final Rule's extraordinary flaws merit the "extraordinary remedy" of preliminarily enjoining enforcement. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The rule creates broad and atextual discretion for the Agencies by way of vague standards that give the States and regulated parties little practical help. So "likelihood of success on the merits" is high. *North Dakota*, 127 F. Supp. 3d at 1053 (citing *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 112-13 (8th Cir. 1981)). The "threat of irreparable harm" to the States is also pressing, and the "balance of the harms" and "the public interest" tip in the States' favor, too, *North Dakota*, 127 F. Supp. 3d at 1053—especially given the Agencies' decision to slip the new rule into the Code of Federal Regulations just before the Supreme Court rules on the same questions at the heart of this suit. All the equities support hitting pause.

## I.     The States Are Likely To Succeed On The Merits Of Their Claims.

The States' likelihood of success on the merits is the most important factor in the preliminary-injunction analysis. *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011). It requires that the States only show a "fair chance of prevailing," *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)—that is, no "greater than fifty per cent" likelihood, *PCTV Gold, Inc. v. SpeedNet*, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007)—on "even one [of their] claim[s]," *Weather Modification LLC v. Brackin*, No. 3:20-cv-73, 2020 WL 4606843, at *3 (D.N.D. June 12, 2020). The States can show far more than a "fair chance" on several of their claims here. This most important factor thus firmly favors the States.

### A.    The Agencies Have Acted Beyond Their Statutory Authority.

A rule violates the APA when it is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).  This provision guards an important separation-of-power principle: "An agency … literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute."  *FEC v. Cruz*, 142 S. Ct. 1638, 1649 (2022) (cleaned up).  So, an agency can never issue a regulation that contradicts statutory text.  *See Brown v. Gardner*, 513 U.S. 115, 122 (1994).  And "analysis of the statutory text"—and thus the scope of the agency's authority—must also be read against "established principles of interpretation."  *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 112 (2014).

In this case, Congress prescribed that the Agencies' authority under the CWA extends to only the "navigable waters," meaning "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  Several parts of this text matter here.  For one thing, Congress used the word "navigable" to show "what [it] had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made."  *SWANCC*, 531 U.S. at 172.  So, at an absolute minimum, waters that bear a "speculative or insubstantial" connection with other waters falling within Congress's traditional jurisdiction cannot constitute "waters of the United States."  *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring).  Even watercourses that might "eventually flow into traditional navigable waters" don't necessarily qualify.  *Id.* at 778.  For another thing, the word "waters" carries meaning, too—so land can fall within this provision only when one can rightfully say that the land is "inseparably bound up with the 'waters' of the United States."  *Riverside Bayview*, 474 U.S. at 134.  And the phrase "of the United States" is important as well.  It tells us that Congress

did not intend for the Agencies to claim "jurisdiction over nonnavigable, isolated, intrastate waters"—that is, waters devoid of a federal interest. *SWANCC*, 531 U.S. at 171.

Many parts of the Final Rule run headlong into this statutory text—indeed, *every* defined category of covered waters in the Final Rule stumbles into some problem with the statutory text. Any one of these problems provides good reason to vacate the rule.

Take the first category: traditional navigable waters, territorial seas, and interstate waters. 88 Fed. Reg. at 3142. This category would be unobjectionable if the Agencies had confined themselves to the first two water types, but claiming jurisdiction over all "interstate waters" goes too far. That last assertion reads the word "navigable" right out of the statute, as the Agencies contend that "interstate waters" includes *all* such waters—even those that are not "connected to navigable waters" in any way. *Id.* at 3074. In fact, the Agencies never even wrestle with the word "navigable." Instead, they insist that they are free to ignore the word because the *Constitution* defines interstate waters as waters of the "several States," which they view as synonymous with the CWA's "waters of the United States" language. *Id.* at 3073. But the constitutional meaning of some similar language is beside the point when it comes to this question of statutory interpretation, at least without evidence that Congress intended to link the two together. And at bottom, "[u]nder such a broad definition, a mere trickle, an isolated pond, or some other small, non-navigable body of water would be under federal jurisdiction simply because it crosses a state line or lies along a state border." *Georgia*, 418 F. Supp. 3d at 1359. So the Agencies' claim of jurisdiction "exceeds [their] authority." *Id.*

Impoundments (like reservoirs) present another conflict between the Final Rule and the CWA's text. Among other things, the Agencies declare that they will assert jurisdiction over impounded waters that were "jurisdictional under [the Final Rule]'s definition at the time the

impoundment was created." 88 Fed. Reg. at 3075. Even waters that have "no outlet or hydrologic connection to the tributary network" can be labeled jurisdictional impoundments if a little hydro-history can show the waters previously would have qualified as WOTUS under the Final Rule. *Id.* at 3077-78. But the CWA does not empower the Agencies to regulate isolated waters merely because they were once "waters of the United States" in the near or distant past. *Cf. Carr v. United States*, 560 U.S. 438, 448 (2010) (explaining that statutes written in the present tense generally do not embrace the past). Were it otherwise, then a bottle of water sitting on a shelf in San Francisco could be a "water of the United States" because it was once drawn from Lake Sakakawea.

The problems in the Final Rule continue with its treatment of tributaries. The rule's definition of "tributary" signals exceptional breadth; a watercourse can qualify as a tributary so long as it makes its way, "directly or indirectly," to a traditional navigable water, territorial sea, or interstate water by any wet *or dry* waterway (even excluded ones), such as wetlands, ditches, or waste treatment centers. 88 Fed. Reg. at 3080. Any water that "eventually" gets to a traditional navigable water, territorial sea, or interstate water can qualify. *Id.*; *see also id.* at 3084 (describing how a "tributary" could include one that flows through "another stream" that in turn flows "only in direct response to precipitation"). Once a water is declared a tributary, it need only bear some "relatively permanent" connection to or "significant nexus" with a navigable water, territorial sea, interstate water, or impoundment to qualify as WOTUS. Even tributaries that "may run dry [for] years" can be treated as relatively permanent. *Id.* at 3085. Ephemeral and intermittent streams can thus become "waters of the United States." And tributaries have a "significant" nexus when, in combination with other "similarly situated" waters in a "region," they have some "material influence"—that is, some more-than-de-minimis effect—on *one* of three aspects of the other water's composition. 88 Fed. Reg. at 3067; *see also, e.g.*, *United States v. Brennan*, 452 F. Supp.

3d 225, 236 n.11 (E.D. Pa. 2020) (collecting definitions that reflect how both "influence" and "material" merely mean "affect").   All the agency-speak disguises the reality: These are "nonnavigable, isolated, intrastate waters" in every sense, and even the most permissive constructions of WOTUS have not extended so far and wide.  *SWANCC*, 531 U.S. at 169.  In fact, this Court preliminary enjoined the 2015 Rule for doing exactly the same thing.  *See North Dakota*, 127 F. Supp. 3d at 1056 (the "breadth of the definition of a tributary … allows for regulation of any area that has a trace amount of water so long as the physical indicators of a bed and banks and an ordinary high water mark exist" (cleaned up)); *accord Georgia*, 418 F. Supp. 3d at 1361-62.

Wetlands are yet another issue, as the Agencies have twisted and bent the "relatively permanent" and "significant nexus" standards into something unrecognizable.  For instance, "adjacent" wetlands are covered if they bear a "continuous surface connection" with "relatively permanent" impoundments or tributaries.  88 Fed. Reg. at 3095.  But in the same breath, the Agencies redefine "continuous surface connection" to cover waterbodies that lack even the most minimal "constant hydrologic connection."  *Id.*  Even a "swale" can qualify.  As for significant nexus, the Agencies jumble together waters "in the region" that are "reasonably close" and might have a "material" effect on jurisdictional impoundments or tributaries.  *Id.* at 3089-90.  Lands that might be damp only sometimes can combine with other only occasionally wet places in "neighboring" vicinities to create some nominal effect on ordinary jurisdictional waters.  So "remote" wetlands—which the Supreme Court has said should *not* be covered—get coverage just the same.  *See Rapanos*, 547 U.S. at 742 (plurality op.); *id.* at 776-77 (Kennedy, J., concurring); *see also North Dakota*, 127 F. Supp. 3d at 1057.

Finally, a new catch-all category capturing purely intrastate waters presents perhaps the most problematic category of jurisdictional waters.  This category is a novel one.  Its closest

analogue was the catch-all in the 1986 Regulations governing intrastate waters that affected interstate commerce, but even the Agencies "ha[d] not in practice asserted jurisdiction over [those waters] under the pre-2015 regulatory regime" in light of *SWANCC*.  88 Fed. Reg. at 3102-03. Like the Final Rule's (mis)treatment of wetlands, this "other waters" definition combines several troubling elements to produce one unlawful result.  "Similarly situated" waters "in the region" can be used to establish a "material influence" on other covered waters, such that even isolated prairie potholes can become "navigable waters" under the CWA.  And because "subsurface connections" can provide a "substantial nexus," the landowner may not even know that she has relevant "waters"—let alone "waters of the United States"—by looking at her own property.  88 Fed. Reg. at 3093.  Thus, water and land that is not a part of any stream network at all can now be "waters of the United States" under this catch-all category.  *Contra SWANCC*, 531 U.S. at 171 (explaining that WOTUS does not embrace "nonnavigable, isolated, intrastate waters").

If the plain text problems with all five categories were not enough, other clear-statement rules and canons of construction confirm that the Agencies have grievously overreached.

The federalism canon is one of them.  Congress must provide a "clear statement" if it wants to shift the "usual constitutional balance of federal and state powers."  *Bond v. United States*, 572 U.S. 844, 858 (2014) (cleaned up).  This clear-statement requirement is triggered when Congress tries to "legislate in areas traditionally regulated by the States" or "impose its will" on them. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  A little oblique writing is not enough; rather, Congress must provide "exceedingly clear" or "unmistakably clear" direction.  *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849-50 (2020); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989).

Here, the Final Rule overturns the present federal-state balance as to land and water issues without even the hint of a clear statement. For decades, Congress has given "purposeful and continued deference to state water law," and it has repeatedly "recognized," "encouraged," and "protect[ed]" the States' rights over their own waters. *California*, 438 U.S. at 653-54. The CWA is no different: It "recognize[s], preserve[s], and protect[s] the primary responsibilities and rights of States" when it comes to pollution mitigation and "the development and use … of land and water resources," 33 U.S.C. § 1251(b) (emphasis added). "Permitting [the Agencies] to claim federal jurisdiction over ponds and mudflats" and other isolated, intrastate waters "would result in a significant impingement of the States' traditional and primary power over land and water use." *SWANCC*, 531 U.S. at 174. Yet the Final Rule marches ahead anyway.

The major-questions doctrine further settles that the Final Rule goes too far. In certain cases involving an assertion of the agency power, "the history and the breadth of the authority that the agency has asserted," along with the "economic and political significance of that assertion," require a "clear statement" from Congress that it meant for the agency to wield its purported power. *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (cleaned up). In such cases, a mere "colorable" or "plausible" basis in the text for the agency's claimed power is not enough. *Id.* at 2609.

In the Final Rule, the Agencies mean to tackle a major question without any green light from Congress signaling them to do so. By everyone's account, the Final Rule will require thousands—maybe millions—of landowners to undertake expensive compliance efforts whenever their property might implicate navigable or interstate waters in the most distant way. The Final Rule will directly restrain farmers, ranchers, energy producers, miners, builders, and many others from using their land as they prefer. Yet Congress has never clearly endorsed this effort. So the Agencies are left to rely on "waters of the United States" alone—a "phrase [that] was not a term

13

of art with a known meaning" that is comprised of "words … [that] are hopelessly indeterminate." *Sackett v. EPA*, 566 U.S. 120, 133 (2012) (Alito, J., concurring).

The canon of constitutional avoidance provides yet another tell that the Final Rule oversteps the CWA's limits.  "[I]t is incumbent on [the Court] to determine whether the agency's interpretation would give rise to serious constitutional questions."  *Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 893 (8th Cir. 2013).  If it would, and the statute can be fairly read another way, then the Court should favor the constitutional path.  *See Almendarez-Torres v. United States*, 523 U.S. 224, 237-38 (1998) (where "fairly possible," courts should construe a statute to avoid any "grave doubts" about its constitutionality).

The Final Rule's gloss on the CWA gives rise to "doubts," "questions," and more when it comes to the Act's consistency with the non-delegation doctrine.  Article I, Section 1 of the U.S. Constitution vests Congress with the legislative power.  And "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529-30 (1935).  So to delegate its power to another branch, Congress must (at a minimum) "lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform."  *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (cleaned up).  But under the Agencies' reading, no intelligible principle can be found.  They disclaim any suggestion that "navigable" is a limit.  88 Fed. Reg. at 3073.  They refuse to confine their reach to moist land, let alone "waters."  *Id.* at 3111-12 (clarifying that jurisdictional "waters" are not "dry land" even though they may "lack water at a given time").  Even the phrase "of the United States" falls by the wayside; the Agencies perceive their jurisdiction to be broad enough to reach *all* activities affecting some ecological function of water.  *Id.* at 3073.  Untethered from any intelligible principles, the

14

Act would violate the non-delegation doctrine. *See, e.g.*, Sean G. Herman, *A Clean Water Act, If You Can Keep It*, 13 GOLDEN GATE U. ENV'T L.J. 63, 77-78 (2021) (explaining how the phrase "waters of the United States" violates the doctrine).

Text and principles, taken together, all counsel the same result: The Final Rule's understanding of the "waters of the United States" cannot stand.

### B.    The Agencies Arbitrarily And Capriciously Adopted The Final Rule.

An agency action is also "unlawful" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The States explained in their Complaint why the Agencies acted arbitrarily and capriciously in several ways when they adopted the Final Rule.  ECF 1, ¶¶ 145-159.  But two items warrant particular mention here.

*First*, the Final Rule offers no clear guidance on much of anything.  To survive arbitrary-and-capricious review, an agency must offer "understandable" findings and rationales, not "unclear or contradictory" ones.  *Assoc. Gas Distribs. v. FERC*, 893 F.2d 349, 361 (D.C. Cir. 1989).  In other words, "ambiguity and lack of clarity in [an agency's] official position" can justify remand.  *FTC v. Atl. Richfield Co.*, 567 F.2d 96, 100 (D.C. Cir. 1977).  Here, the agency "jettison[ed] relative predictability for [an] open-ended rough-and-tumble of factors," *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 547 (1995), all informed by confusing terminology like "wetland mosaics," 88 Fed. Reg. at 3093, "neighboring" but non-contiguous waters, *id.* at 3119, and "chemical, physical, or biological integrity" that can "evolve over time," *id.* at 3116.  "In the absence of an explanation," holistic, feelings-based tests like these "can become simply a cloak for agency whim—or worse."  *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (Roberts, J.).  Witness, for example, the multi-step "guidance for landowners" that the Final Rule provides for those wishing to do something on their own land—it

provides only vagaries and "resources," with a final suggestion to contact the Agencies to confirm jurisdiction and permitting requirements.  88 Fed. Reg. at 3130-35.  How, then, are the States to judge where their millions of acres fall within this scheme?

*Second*, the Final Rule arbitrarily and capriciously mishandles its cost-benefit analysis. The Agencies thought the Final Rule would lead to only "de minimis costs" generally, 88 Fed. Reg. at 3007, while imposing no "new costs or other requirements [as to] states," *id.* at 3141.  The Agencies so concluded because they thought the Final Rule was consistent with the pre-2015 enforcement regime that was reinstated just before the Final Rule's promulgation.  Any "increase in waters being found to be jurisdictional under the final rule in comparison to the pre-2015 regulatory regime," the Agencies assured, would thus be "unquantifiable" but "slight."  U.S. ENV'T PROT. AGENCY & U.S. ARMY CORPS OF ENG'RS, REVISED DEFINITION OF "WATERS OF THE UNITED STATES": RESPONSE TO COMMENTS DOCUMENT, SECTION 5 – RULEMAKING PROCESS AND OTHER STATUTES' REQUIREMENTS 38 (2022), *available at* https://bit.ly/3RYgkko.  Yet as explained above (and in the Complaint, *see* ECF 1, ¶¶ 145-159), the Agencies were wrong; the Final Rule and the Agencies' pre-2015 practice are at odds in several key ways, which guarantees an accompanying increase in cost.

All in all, the Final Rule does not reflect reasoned judgment for these and other reasons. The States will succeed in showing that the Court should therefore vacate that rule.

**C.   The Agencies Did Not Comply With Important Procedural Requirements.**

The APA also requires administrative rules to be procedurally sound.  *See* 5 U.S.C. § 706(2)(D) (a final agency action shall be held "unlawful and set aside" if found to be "without observance of procedure required by law").  For several reasons, the Final Rule is not.

The most obvious reason is the Agencies' failure to comply with the Regulatory Flexibility Act. That law "requires an agency undergoing informal rulemaking to prepare and publish a regulatory flexibility analysis that details, among other things, the rule's 'significant economic impact on small entities' and the steps the agency has taken to minimize that impact." *Northport Health Servs. of Ark., LLC v. U.S. Dep't of Health & Hum. Servs.*, 14 F.4th 856, 876 (8th Cir. 2021) (quoting 5 U.S.C. § 604). An agency can skip that analysis only if the "head of the agency certifies that the rule will not … have a significant impact on a substantial number of small entities." *Northport Health Servs.*, 14 F.4th at 876. A "cursory explanation" for this decision to certify is not enough. *Id.* at 877.

The Agencies unreasonably concluded that the Final Rule would have "no significant impact." 88 Fed. Reg. at 3139-40. They assumed that no real impacts would follow because the Final Rule introduces only "de minimis differences" from the rule in place since the 2020 NWPR vacatur, while generally "narrow[ing] the scope of jurisdiction from the text of the 1986 regulations." *Id.* But as explained already, that view is flatly mistaken. The so-called "de minimis" differences between the pre-2015 state of play and now are substantial. And the "text" of the 1986 regulations is the wrong comparator because the Agencies had not enforced the relevant portions of that text for more than two decades, 88 Fed. Reg. at 3102-03. Beyond that, the Agencies declared that the Final Rule "does not directly apply to specific entities." 88 Fed. Reg. at 3139. That finding is blind to reality. The Final Rule directly affects, among many others, the many landowners who now find themselves subject to federal jurisdiction, permitting requirements, operations restrictions, and more. Even the potential specter of federal jurisdiction provides enough reason to say that the Final Rule "applies" to parties; those parties who *may* be within the Final Rule's grasp will still need to undertake expensive assessments, forego their

activities on the potentially covered property, or risk serious civil and criminal penalties.  Indeed, because of the sizeable expense of resolving CWA jurisdiction and related permitting obligations, small entities who can't afford to pay will likely be among those *most* affected by the Final Rule. *See, e.g.*, 88 Fed. Reg. at 3135 (estimating the "typical cost" of "the individual permit process for a project affecting up to three acres of jurisdictional waters is between $15,500 and $37,300.").

The Agencies also failed to provide full notice and comment on all relevant aspects of the Final Rule. "To satisfy the APA's notice requirement, the [notice of proposed rule making] and the final rule need not be identical[;]" however, a final rule must be "a 'logical outgrowth' of its notice."  *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009).  So, for instance, a previously unannounced and more expansive definition first offered in a final rule can run afoul of the notice requirement.  *See, e.g.*, *North Dakota*, 127 F. Supp. at 1058 (finding that definition of "neighboring" in 2015 WOTUS rule was not a logical outgrowth of proposed rule); *see also Texas v. EPA,* 389 F. Supp. 3d 497, 504-06 (S.D. Tex. 2019) (detailing the 2015 Rule's violations of notice-and comment requirements); *Georgia*, 418 F. Supp. 3d at 1372-78 (same).

Several new elements that are not "logical outgrowths" of the proposed rule appeared for the first time in the Final Rule.  For instance, the Agencies use the idea of a "wetland mosaic" to explain how they will identify adjacent wetlands.  88 Fed. Reg. at 3093.  That concept is nowhere to be found in the proposed rule.  Likewise, the Agencies redefine "significant nexus" to mean any "material influence."  But that term, used 26 times in the Final Rule, was never mentioned before. Tributaries are now considered with other similar tributaries in their same "catchment."  That concept, too, was absent from the proposed rule.  These and other new additions are central yet unanticipated revisions.  The Final Rule is by its very nature a definitional rule, so new definitions, tests, and standards necessarily change the whole analysis for relevant stakeholders.  States would

have liked to comment, for example, on any suggestion that something as minimal as a "material influence" derived from some ambiguous amalgamation of waters across an awesomely vast area endows the Agencies with jurisdiction.  (The Mississippi River catchment, for instance, covers "some forty percent of the country."  Donald Worster, *Watershed Democracy: Recovering the Lost Vision of John Wesley Powell*, 23 J. LAND RES. & ENV'T L. 57, 58 (2003)).

The Agencies did not follow procedure.  They should be compelled to go back and do so.

### D.   The Agencies Have Violated the Constitution.

Lastly, the APA will not permit a rule to stand if it is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  The Final Rule conflicts with at least three different constitutional limitations.

**1.**   The Commerce Clause is the first constitutional concern here.  Congress may "regulate commerce with foreign nations, and among the several states."   U.S. CONST. art. I, § 8.  So Congress can regulate "channels of interstate commerce," "the instrumentalities of interstate commerce, or persons or things in interstate commerce," and activities that substantially affect interstate commerce.  *United States v. Morrison*, 529 U.S. 598, 608-09 (2000) (cleaned up). "[C]ommerce among the States is not a technical legal conception, but a practical one."  *Goldberg v. Wade Lahar Const. Co.*, 290 F.2d 408, 415 (8th Cir. 1961).  And when it comes to the CWA, Congress's authority over "waters of the United States" is tied to navigable channels of interstate commerce.  *SWANCC*, 531 U.S. at 172.

The Final Rule impermissibly reaches land and waters without requiring that they bear a direct connection to navigable waters or otherwise bear some substantial relationship with (or otherwise substantially affect) interstate commerce.  In fact, the Final Rule *removes* portions of the 1986 Regulations that spoke directly to interstate commerce, replacing that category with the

catch-all "other waters" category that does not carry with it any meaningful connection with commerce.  It did so even though "Clean Water Act jurisdiction is not co-extensive with Congress' Commerce Clause authority."  *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 183 (D.D.C. 2008).  And it extends the Agencies' reach to nonnavigable, isolated, intrastate waters, even though the Supreme Court has warned that regulating such places raises serious Commerce Clause concerns.  *SWANCC*, 531 U.S. at 173.

**2.**  The Tenth Amendment presents yet another constitutional obstacle for the Final Rule. That amendment says that "[t]he powers not delegated to the United States by the Constitution ... are reserved to the States respectively, or the people."  U.S. CONST. amend. X.  In applying this prescription, a court should ask whether a federal act "invades the province of state sovereignty." *New York v. United States*, 505 U.S. 144, 155 (1992).  The authority to regulate intrastate land use and water resources is one such province.  *See, e.g.*, *SWANCC*, 531 U.S. at 174 ("[R]egulation of land use [is] a function traditionally performed by local governments.").

As should be clear by now, the Final Rule strikes at the heart of the States' reserved power over land and water.  Under the Final Rule, States become secondary regulatory players as to a variety of purely intrastate waters with only the most tenuous connections to waters imbued with some national interest.  Federal standards will now become the *de facto* rule for environmental regulation.  Those standards will in turn dictate how States and their residents employ their own property, making land and water development a *de facto* federal issue, too.

**3.**  The Final Rule faces a third constitutional strike against it: the Fifth Amendment's Due Process Clause.  The Due Process Clause dooms certain laws that are unduly vague.  And a law crosses that threshold when it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."

*Connally v. Gen. Const. Co*, 269 U.S. 385, 391 (1926).  The Final Rule is rife with administrative jargon that would confuse even an exceptionally intelligent reader:  "adjacent," "certain times of year," "interstate waters," "impoundments," "material influence," "mosaic," "relatively permanent," "seasonally," "significantly affect," "significant nexus," "similarly situated," and "tributaries" are but a few examples.  These terms are then paired with fuzzy we-know-it-when-we-see-it standards—often implicating multi-factor tests—that make it next to impossible for the typical landowner to know what to do.  And if the landowner guesses wrong, the consequences are dire: crushing civil penalties and potential criminal punishment for individuals who discharge or dredge in "waters of the United States."   33 U.S.C. § 1319; *Hawkes*, 578 U.S. at 600. Circumstances like these render the Final Rule void for vagueness.  *See* Paul J. Larkin, *The Clean Water Act and the Void-for-Vagueness Doctrine*, 20 Geo. J.L. & Pub. Pol'y 639, 659-62 (2022).

## II.    The Remaining Preliminary Injunction Factors Favor The States.

Serious consequences flow from the Final Rule's unlawful expansion of federal authority. If the rule goes into effect on March 20, the States will see unrecoverable losses to their sovereign interests and to their budgets, and the public will suffer.  The remaining factors support granting preliminary relief, too.

### A.  The Final Rule Will Irreparably Harm The States.

The Final Rule is poised to cause the sort of "certain," "great," and "imminen[t]" harm that rises to a "clear and present need for" preliminary equitable relief.  *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996).

*First*, "[l]oss of sovereignty is an irreparable harm," *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018)—particularly where the States are deprived "of those interests without first having a full and fair opportunity to be heard on the merits," *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).  *See also Akiachak Native Cmty. v. Jewell*, 995 F.Supp.2d 7, 17

(D.D.C. 2014) (recognizing loss of state sovereignty as an irreparable harm). The Final Rule imposes just this sort of injury—recall the Tenth Amendment and federalism canon considerations. By improperly expanding federal jurisdiction to substantial numbers of intrastate waters, the Final Rule saps the States of their "traditional and primary power over land and water use." *North Dakota*, 127 F. Supp. 3d at 1059 (quoting *SWANCC*, 531 U.S. at 174). This power is "obvious, indisputable," and "omnipresent." *Hudson Cnty. Water Co. v. McCarter*, 209 U.S. 349, 356 (1908). Each of the States manages and protects the lands and waters within their borders, and many own some of these intrastate resources directly. *See* ECF 1, ¶¶ 20-53. But the Final Rule limits the States' exercise of this "essential attribute of sovereignty." *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 631 (2013). *See, e.g.*, Exs. A, ¶¶ 3-4; F, ¶¶ 11-13; G, ¶¶ 4-6; H, ¶¶ 12-14; and I, ¶¶ 8-14. That loss is irrecoverable.

*Second*, expanded federal jurisdiction swells the States' obligations under several CWA programs. When it comes to water quality standards, for instance, States must identify newly jurisdictional waters within their borders, assess their uses, and determine if they meet an already existing standard or establish a Total Maximum Daily Load if they do not. *See* ECF 1, ¶¶ 55-56. The States must also evaluate, issue, and enforce new National Pollution Discharge Elimination System permits for businesses and homeowners before they can discharge pollutants into a newly covered water. *See* ECF 1, ¶ 58. Both of these time- and resource-intensive endeavors will become heavy burdens under the Final Rule. *See, e.g.*, Exs. A, ¶¶ 5-7, 13, 15, 17; B, ¶¶ 2-3, 5 (burden from projected increase of permits); C, ¶¶ 2-7; D, ¶¶ 3-6; E, ¶¶ 3, 5; G, ¶¶ 6-10 (resources that must now be spent to decipher Final Rule's "ambiguous standards"); H, ¶¶ 7, 15; and J, ¶¶ 3-6.

Courts have looked to similar costs when finding irreparable harm before. *See Georgia*, 326 F. Supp. 3d at 1367; *North Dakota*, 127 F. Supp. 3d at 1059. If anything, these costs are worse

22

here because of the added burdens from assessing what the Final Rule's opaque case-by-case determination approach covers in the first place. *See, e.g.*, Exs. A, ¶¶ 6, 9-12 ("extremely heavy burden" from rule's "woefully inadequate" consideration of "Alaska-specific conditions"); C, ¶¶ 6-13 (significant nexus factors "seem … subjective," introduce "greater level of uncertainty"); E, ¶¶ 3, 5; F, ¶¶ 9, 11; G, ¶¶ 6-10; and J, ¶ 7.  The States and their environmental agencies have already tallied significant costs parsing the two rules that came before; the regulatory whiplash from three rules in eight years makes the harm that much more severe. *See, e.g.*, Exs. A, ¶ 8; G, ¶¶ 11-13; H, ¶ 7 ("considerable burden" from "[k]eeping current with the continually changing federal WOTUS rules"); I, ¶¶ 15-16; and J, ¶ 8.  And add to *that* the wasted effort of trying to understand and comply with a regulatory regime that may well be set aside—under either existing precedent or the Supreme Court's soon-anticipated *Sackett* decision.   Depending on *Sackett*'s reach, for instance, the Agencies might ask for voluntary remand to adjust the regulatory landscape *again*.  All this means that even if the Agencies' (bordering disingenuous) insistence were true that the Final Rule will have no "substantial direct effect[] on the States" or "on the distribution of power and responsibilities" between the States and the Agencies, 88 Fed. Reg. at 3140-41, the States will still face significant costs learning and applying a new framework that may ultimately be for nothing. *See, e.g.*, Exs. C, ¶¶ 13 ("wasteful … time and effort in applying this Rule … until its fate is known"); D, ¶ 7; E, ¶ 4; F, ¶¶ 17-18; G, ¶¶ 11-13; H, ¶¶ 7, 16; I, ¶¶ 15-16; and J, ¶ 8.

Worse yet, the States stand no chance to get these "undeniable … monetary losses" back. *North Dakota*, 127 F. Supp. 3d at 1059; *see also Georgia*, 326 F. Supp. 3d at 1367 ("no avenue exists to recoup those losses").  "[U]nrecoverable economic loss" like this is a classic form of irreparable harm. *Iowa Utils. Bd.*, 109 F.3d at 426; *see also Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (sovereign immunity not waived for APA damages actions).

23

*Third*, the Final Rule's burdens and confusion stack on costs for projects and development throughout the States.  Some of these are taxpayer-funded, and new jurisdictional assessments and permitting processes from the Final Rule's expanded reach will make them more expensive and slower to finish.  *See, e.g.*, Exs. A, ¶ 14; C, ¶¶ 7-8, 11-12; E, ¶ 3 (projects suffered costs, delays); F, ¶¶ 6-10, 15-16 (project "immediately threaten[ed]" because it "runs through the prairie pothole region" that is "now potentially WOTUS"); G, ¶ 7; I, ¶¶ 10-14, 16 (massive harm to pipeline, water supply, and dam projects).  The same is true when the States are not directly involved in a given project: Delay and budget increases will lead to lost tax revenue from projects cancelled or delayed. *See, e.g.*, Exs. A, ¶ 16 ("[t]his uncertainty negatively affects our investment climate"); E, ¶ 4 ("potential to deter important investment in the state"); and H, ¶¶ 7-11, 13, 17.  All these costs are steep and (unless the Court steps in first) irreparable.

## B.    The Balance Of Harms And The Public Interest Support An Injunction.

From all angles, a "particular regard for the public consequences" of the Final Rule and the balance of harms weigh in favor of the States.  *Winter*, 555 U.S. at 24.  So these last two preliminary injunction factors—which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—support immediate relief, too.

It benefits the public to "ensure that federal agencies do not extend their power beyond the express delegation from Congress."  *North Dakota*, 127 F. Supp. 3d at 1060.  More concretely, the public wins if the farmers, small businesses, and homeowners in our States can avoid spending significant time and money complying with a rule that will very likely be set aside at the end of this case.  An injunction can avoid this massive waste of resources and delayed projects in pursuit of permits that may soon be legally irrelevant.  *See*, *e.g.*, *Texas v. EPA*, No. 3:15-cv-00162, 2018 WL 4518230, at *1 (S.D. Tex. Sept. 12, 2018) (explaining that denying an injunction would "risk[]

asking the states … and their citizens to expend valuable resources and time operationalizing a rule that may not survive judicial review").

By contrast, the Agencies and the public will not suffer any harms that would justify holding back injunctive relief.  The Agencies serve the public, which "has no interest in the enforcement of what is very likely" an unenforceable rule.  *Georgia*, 326 F. Supp. 3d at 1370.  Any harms the Agencies may conjure from "complying with an injunction" are also not enough "to tip the balance against an injunction."  *Id.* at 1369.

And in any event, it is difficult to see what those harms might be.  The Agencies present the Final Rule as largely codifying the status quo:  Since the 2020 Rule was vacated in summer 2021, the Agencies have been interpreting "WOTUS" "consistent with the pre-2015 regulatory regime."  88 Fed. Reg. at 3007.  And they insist that the Final Rule is "founded" on that same "familiar pre-2015 definition," *id.* at 3005—so much so that they claim it has "de minimis costs *and benefits*" when compared against the "baseline of the current status quo," *id.* at 3007 (emphasis added).  Given that "[t]he purpose of a preliminary injunction" is to "preserve the status quo," *W. Plains, LLC v. Retzlaff Grain Co. Inc.*, 870 F.3d. 774, 785 (8th Cir. 2017) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)), it seems the Agencies would be hard pressed to object. *See In re EPA*, 803 F.3d 804, 808 (6th Cir. 2015) (explaining, as to the 2015 Rule, that "the sheer breadth of the ripple effects caused by the Rule's definitional changes counsels strongly in favor of maintaining the status quo for the time being").  To the extent they may nonetheless argue that an injunction would threaten natural resources, the Final Rule does nothing to change the fact that all local lands and waters remain under the States' traditional protection.  *See* ECF 1, ¶¶ 20-53.

## CONCLUSION

The Court should preliminary enjoin the Agencies from enforcing the Final Rule.

Respectfully submitted,

PATRICK MORRISEY
Attorney General of West Virginia

/s/ Michael R. Williams
Lindsay See
  Solicitor General
Michael R. Williams
  Senior Deputy Solicitor General

Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for State of West Virginia*

DREW H. WRIGLEY
Attorney General of North Dakota

/s/ Margaret I. Olson
Margaret I. Olson – State Bar ID No. 06352
Jennifer L. Verleger – State Bar ID No. 06732
  Assistant Attorneys General

Office of Attorney General
500 N. 9th Street
Bismarck, ND 58501
Phone: (701) 328-3640
dwrigley@nd.gov
jverleger@nd.gov
maiolson@nd.gov

*Counsel for State of North Dakota*


CHRISTOPHER M. CARR
Attorney General of Georgia

/s/ Stephen J. Petrany
Stephen J. Petrany
  Solicitor General

Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

BRENNA BIRD
Attorney General of Iowa

/s/ Eric H. Wessan
Eric H. Wessan
  Solicitor General

1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*


STEVE MARSHALL
Attorney General of Alabama

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr. (ASB-9182-U81L)
  Solicitor General

Office of the Attorney General
State of Alabama

TREG TAYLOR
Attorney General of Alaska

/s/ David A. Wilkinson
David A. Wilkinson
  Senior Assistant Attorney General

1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501

501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for State of Alabama*

(907) 269-5100
david.wilkinson@alaska.gov

*Counsel for State of Alaska*

TIM GRIFFIN
Attorney General of Arkansas

/s/ Dylan L. Jacobs
Nicholas J. Bronni
  Solicitor General
Dylan L. Jacobs
  Deputy Solicitor General

Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for State of Arkansas*

ASHLEY MOODY
Attorney General of Florida

/s/ Natalie P. Christmas
Natalie P. Christmas (Fla. Bar 1019180)
  Assistant Attorney General of Legal Policy

Florida Attorney General's Office
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)

natalie.christmas@myfloridalegal.com

*Counsel for State of Florida*

THEODORE E. ROKITA
Attorney General of Indiana

/s/ Thomas M. Fisher
Thomas M. Fisher
  Solicitor General

Indiana Attorney General's Office
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
(317) 232-6255
tom.fisher@atg.in.gov

*Counsel for State of Indiana*

KRIS KOBACH
Attorney General of Kansas

/s/ Jesse A. Burris
Jesse A. Burris
  Assistant Attorney General

Kansas Attorney General's Office
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for State of Kansas*

27

JEFF LANDRY
Attorney General of Louisiana

/s/ Elizabeth B. Murrill
Elizabeth B. Murrill
  Solicitor General
J. Scott St. John
  Deputy Solicitor General
Tracy Short
  Assistant Attorney General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
Attorney General of Mississippi

/s/ Justin L. Matheny
Justin L. Matheny (MS Bar No. 100754)
  Deputy Solicitor General

Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Fax: (601) 359-2003
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW BAILEY
Attorney General of Missouri

/s/ Joshua M. Divine
Joshua M. Divine, Mo. Bar No. 69875
  Solicitor General
Jeff P. Johnson, Mo. Bar No. 73249
  Deputy Solicitor General

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
Josh.divine@ago.mo.gov

*Counsel for State of Missouri*

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ Eric J. Hamilton
Eric J. Hamilton
  Deputy Solicitor General

AUSTIN KNUDSEN
Attorney General of Montana

/s/ Christian B. Corrigan
Christian B. Corrigan
  Solicitor General
Brent Mead
  Deputy Solicitor General

Office of the Montana Attorney General
215 N Sanders St
Helena, MT 59601
(406) 444-2707
Christian.Corrigan@mt.gov

*Counsel for State of Montana*

JOHN M. FORMELLA
Attorney General of New Hampshire

/s/ Brandon F. Chase
Anthony J. Galdieri
  Solicitor General

Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Eric.Hamilton@nebraska.gov

*Counsel for State of Nebraska*

Brandon F. Chase
  Assistant Attorney General

New Hampshire Department of Justice
33 Capitol Street
Concord, NH  03301
(603) 271-3650
brandon.f.chase@doj.nh.gov

*Counsel for State of New Hampshire*

DAVE YOST
Attorney General of Ohio

/s/ Benjamin M. Flowers
Benjamin M. Flowers
  Ohio Solicitor General

30 E. Broad St., 17th Floor
Columbus, OH 43215
Phone:  614.466-8980
bflowers@ohioago.gov

*Counsel for State of Ohio*

GENTNER F. DRUMMOND
Attorney General of Oklahoma

/s/ Garry M. Gaskins, II
Garry M. Gaskins, II
  Solicitor General
Zach West
  Director of Special Litigation
Jennifer L. Lewis
  Assistant Attorney General

313 N.E. 21st Street
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.gaskins@oag.ok.gov
Zach.west@oag.ok.gov
Jennifer.lewis@oag.ok.gov

*Counsel for State of Oklahoma*

ALAN WILSON
Attorney General of South Carolina

/s/ J. Emory Smith, Jr.
J. Emory Smith, Jr.
  Deputy Solicitor General

Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Phone:  (803) 734-3680; Fax:  (803) 734-3677
Email:   ESmith@scag.gov

MARTY J. JACKLEY
Attorney General of South Dakota

/s/ Charles D. McGuigan
Charles D. McGuigan
  Deputy Attorney General Civil Division

1302 E. Highway 14, Suite 1
Pierre, SD 57501
605-773-3215
atgservice@state.sd.us

*Counsel for State of South Dakota*

*Counsel for State of South Carolina*


JONATHAN SKRMETTI
Attorney General and Reporter
of the State of Tennessee

/s/ Clark L. Hildabrand
Andreé Blumstein
 Solicitor General
Clark L. Hildabrand
 Assistant Solicitor General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for State of Tennessee*


SEAN REYES
Attorney General of Utah

/s/ Melissa Holyoak
Melissa Holyoak
 Solicitor General

Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for State of Utah*


JASON MIYARES
Attorney General of Virginia

/s/ Andrew N. Ferguson
Andrew N. Ferguson
 Solicitor General
Kevin M. Gallagher
 Deputy Solicitor General
M. Jordan Minot
 Assistant Solicitor General

Virginia Attorney General's Office
202 North 9th Street
Richmond, Virginia 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us
mminot@oag.state.va.us

*Counsel for Commonwealth of Virginia*


BRIDGET HILL
Attorney General of Wyoming

/s/ Travis Jordan
Travis Jordan (ND Bar No. 08933)
 Senior Assistant Attorney General

Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
travis.jordan@wyo.gov

*Counsel for State of Wyoming*

## CERTIFICATE OF SERVICE

I certify that on February 21, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record, and I will serve the foregoing via certified mail to the following:

U.S. Environmental Protection Agency
Office of the Administrator
Mail code: 1101A
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Michael S. Regan,
Administrator, U.S. Environmental Protection Agency
Office of the Administrator
Mail code: 1101A
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

U.S. Army Corps of Engineers
Office of Assistant Secretary of the Army (Civil Works)
441 G Street N.W.
Room 6P90
Washington, D.C. 20314-1000

Michael L. Connor
Assistant Secretary of the Army for Civil Works
Department of the Army
108 Army Pentagon
Washington, D.C. 20310-0108

Lieutenant General Scott A. Spellmon
Chief of Engineers and Commanding General
U.S. Army Corps of Engineers
441 G Street N.W.
Room 6P90
Washington, D.C. 20314-1000

The Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

*/s/ Michael R. Williams*

## INDEX OF EXHIBITS

| Ex. | Title |
|---|---|
| A | Declaration of Randy Bates<br>Director of Division of Water, Alaska Department of Environmental Conservation |
| B | Declaration of Anna Truszczynski<br>Chief, Watershed Protection Branch, Environmental Protection Division<br>Georgia Department of Natural Resources |
| C | Declaration of Scott Marler<br>Director, Iowa Department of Transportation |
| D | Declaration of Lori McDaniel<br>Water Quality Bureau Chief, Iowa Department of Natural Resources |
| E | Declaration of Mike Naig<br>Secretary of Agriculture, Iowa Department of Agriculture |
| F | Declaration of Duane DeKrey<br>General Manager, Garrison Conservancy District (North Dakota) |
| G | Declaration of L. David Glatt<br>Director, North Dakota Department of Environmental Quality |
| H | Declaration of Douglas Goehring<br>Agricultural Commissioner, North Dakota Department of Agriculture |
| I | Declaration of Andrea Travnicek<br>Director, North Dakota Department of Water Resources |
| J | Declaration of Jason Foster<br>Chief Engineer of Development/Deputy State Highway Engineer<br>West Virginia Department of Transportation |