**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF WEST VIRGINIA, *et al.,* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| and | ) |
| | ) |
| AMERICAN FARM BUREAU | ) |
| FEDERATION, *et al.,* | ) Civil No. 3:23-cv-0032 |
| | ) |
| Intervenor-Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| U.S. ENVIRONMENTAL PROTECTION | ) |
| AGENCY, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**INTERVENOR-PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR**
<u>**PRELIMINARY INJUNCTION**</u>

Pursuant to Federal Rule of Civil Procedure 65, the intervenor business plaintiffs ("plaintiffs")[1] respectfully move for the entry of a preliminary injunction prohibiting defendants from enforcing, implementing, applying, or otherwise giving effect to the *Revised Definition of "Waters of the United States"* ("Rule"), 88 Fed. Reg. 3004 (Jan. 18, 2023) (**Exhibit B**).

## INTRODUCTION

The Rule was published on January 18, 2023, and took effect on March 20. Twenty four States filed their Complaint on February 16, 2023. (Dkt. 1). Plaintiffs here moved for leave to intervene on February 21, 2023, and were granted leave to intervene on March 22. (Dkt. 110).

The Rule, which has now been enjoined in Texas and Idaho, *Texas v. EPA*, No. 3:23-cv-17, ECF 60 (Mar. 19, 2023) ("*Texas*"), is a sprawling regulation of immense national importance that defines the extent to which the U.S. Environmental Protection Agency and U.S. Army Corps of Engineers (the "Agencies") possess regulatory jurisdiction under the Clean Water Act ("CWA"). The Rule purports to clarify the Agencies' definition of "waters of the United States" ("WOTUS") as used in the CWA (*see* 33 U.S.C. § 1362(7)), and as such defines the geographic reach of the CWA. *See Rapanos v. United States*, 547 U.S. 715, 742 (2006) (plurality). But the Rule contradicts the statute it is meant to enforce, allowing assertion of federal jurisdiction over water and land no matter how remotely connected to a navigable water, and even if there is no such connection. The Rule is also hopelessly vague, leaving plaintiffs' members and their clients

---

[1] Intervenor-plaintiffs are the American Farm Bureau Federation; American Petroleum Institute; American Road and Transportation Builders Association; Associated General Contractors of America; Cass County Farm Bureau; Leading Builders of America; National Apartment Association; the National Association of Home Builders of the United States; National Association of REALTORS®; National Cattlemen's Beef Association; National Corn Growers Association; National Mining Association; National Multifamily Housing Council; National Pork Producers Council; National Stone, Sand and Gravel Association; North Dakota Farm Bureau; Public Lands Council; and U.S. Poultry and Egg Association.

guessing whether their lands include WOTUS and at risk of severe criminal and civil sanctions for making ordinary use of their property. And the Rule is an improper attempt to resolve an important question of the scope of federal authority over geographic features found in every corner of the Nation. Such major questions must be answered by Congress, not executive agencies.

Plaintiffs represent virtually every element of the national economy across the country. They, their members, and their members' clients will be irreparably harmed if the Rule is implemented before their legal challenges are resolved. The Rule makes clear that the Agencies will exert jurisdiction over a staggering range of wet features no matter how remote from actual navigable waters, and even if they lack a physical connection to navigable waters at all. This matters a great deal to plaintiffs' members and their clients. Under the CWA, a person may not "discharge" "any pollutant" without a permit issued under Section 402, for discharges covered by the National Pollution Discharge Elimination System ("NPDES"), or Section 404 for discharges of dredged or fill material. 33 U.S.C. § 1311(a). A "discharge" is the "addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12)(A). "Navigable waters" are "the waters of the United States." *Id.* § 1362(7). Thus, if a water or land feature falls within the definition of WOTUS, it is within the Agencies' jurisdiction and subject to the CWA's permitting regime.

The consequences of the Rule are stunningly severe. A landowner can go to jail for even negligently interfering with a WOTUS she never knew was jurisdictional, and face potentially huge daily civil penalties, as well as suits from private interest groups. And if a CWA permit is required, it is expensive to obtain and often comes with costly-to-implement conditions. Because of these risks, if there is any doubt whether a feature is a WOTUS, landowners and users must either submit to expensive jurisdictional determination or permitting processes for features never before thought to fall within the CWA, or else forgo the planned use of the land. Exacerbating

these harms, the Rule requires plaintiffs' members to assess not only their own property, but also vast expanses of land beyond their own holdings, using multiple vaguely defined connections to potentially remote features to try to assess whether their land contains WOTUS. The broad scope of features deemed WOTUS, combined with the Rule's intractable vagueness, impose all these immediate, large, and irreparable costs on plaintiffs' millions of members.

A Texas district court has enjoined implementation of the Rule in two States. This Court should now enjoin the Rule nationwide, given the geographic breadth of plaintiffs' interests.

## STATEMENT OF RELEVANT FACTS

### A.      The Rule.

The Rule (at 88 Fed. Reg. 3005-06) interprets WOTUS expansively to include:

[1] traditional navigable waters, the territorial seas, and interstate waters ("paragraph (a)(1) waters"); [2] impoundments of [WOTUS] ("paragraph (a)(2) impoundments"); [3] tributaries to [paragraph (a)(1) waters] or paragraph (a)(2) impoundments when the tributaries meet either the relatively permanent standard or the significant nexus standard ("jurisdictional tributaries"); [4] wetlands adjacent to paragraph (a)(1) waters, wetlands adjacent to . . . paragraph (a)(2) impoundments, wetlands adjacent to tributaries that meet the relatively permanent standard, and wetlands adjacent to paragraph (a)(2) impoundments or jurisdictional tributaries when the wetlands meet the significant nexus standard ("jurisdictional adjacent wetlands"); and [5] intrastate lakes and ponds, streams, or wetlands not identified in paragraphs (a)(1) through (4) that meet either the relatively permanent standard or the significant nexus standard ("other intrastate jurisdictional waters" or "paragraph (a)(5) waters").

The Agencies define the "relatively permanent standard" to mean "waters that are relatively permanent, standing or continuously flowing waters" connected to paragraph (a)(1) traditional navigable waters, interstate waters, and the territorial seas, "and waters with a continuous surface connection to such relatively permanent waters or to paragraph (a)(1) waters." 88 Fed. Reg. 3038. The Rule does not define "relatively permanent."

The Agencies define the "significant nexus standard" as "waters that, either alone or in combination with similarly situated waters in the region, significantly affect the chemical,

physical, or biological integrity of traditional navigable waters, the territorial seas, or interstate waters." 88 Fed. Reg. 3006. The Rule does not clearly define "similarly situated" or "in the region" or how to measure "significant affect" or what "chemical, physical, or biological integrity" means.

The Agencies interpret "similarly situated" to mean that "waters are providing common, or similar, functions for paragraph (a)(1) waters such that it is reasonable to consider their effects together." 88 Fed. Reg. 3127. Plaintiffs can only guess what "functions" are sufficiently "similar" to meet this "reasonableness" standard.

The Agencies interpret "in the region" to mean that the feature in question "lie[s] within the catchment area of the tributary of interest." 88 Fed. Reg. 3088. That leaves plaintiffs' members wondering if a low spot in a field is a WOTUS, and requires them to look at any feature that might be "similar" located anywhere in a potentially vast and ill-defined "catchment" area.

The Rule vaguely defines "significantly affect" as a "material influence on the chemical, physical, or biological integrity" of a paragraph (a)(1) water. 88 Fed. Reg. 3143. To apply this standard, the Agencies look to vague factors like "distance from a paragraph (a)(1) water," "hydrologic factors," the waters that have been determined to be "similarly situated," and "climatological variables." *Id*. This opaque definition provides no guidance to plaintiffs, their members, and their clients to determine if their property contains WOTUS. And these undefined concepts ensure no landowner can ever look at its property and know whether the land contains a WOTUS until the Agencies reveal the answer.

The Rule allows for case-specific assertions of jurisdiction over a broad category of "waters." 88 Fed. Reg. 3024. And the "paragraph (a)(5) waters" category encompasses intrastate, non-navigable features that were previously considered to be "isolated" and thus not within the CWA's jurisdiction. *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531

U.S. 159, 167, 171 (2001) ("*SWANCC*"). The Agencies did not exert jurisdiction over this category of waters under its 2008 Guidance (attached as **Exhibit C** and compare 1986 Rules, **Exhibit D**).

**B.     The Rule's impact on plaintiffs' members and their clients.**

The Rule exposes plaintiffs' members to a vague and burdensome legal regime that does not guide the Agencies in the exercise of their discretion and threatens land users with substantial criminal and civil liability for ordinary uses of land. Briggs Decl. ¶¶ 14, 33.[2]

**1.     The Rule's expansiveness and vagueness create harmful uncertainty for plaintiffs, their members, and members' clients across the Nation.**

The Rule leaves plaintiffs' members and their clients to guess whether a feature on their property will be considered a WOTUS by the Agencies, because so many key components of the Rule that go directly to the jurisdictional determination are unclear. Briggs Decl. ¶¶ 44-52. The use of vague terms to determine whether a feature is within the Agencies' jurisdiction, such as "similarly situated" and "material influence," is especially problematic because of those terms' potential expansiveness. *Id.* ¶ 44; Goldstein Decl. ¶ 12; Rorick Decl. ¶ 12. Additionally, the Rule permits the Agencies to make case-specific determinations, which will vary from field office to field office, using remote desktop technology unavailable to most farmers. Briggs Decl. ¶ 48. And the Rule will require property owners to gain access to others' properties in order to attempt to assess aggregate impacts of "similarly situated" features. Murphy Decl. ¶ 13.

The uncertainty created by the Rule's vague terms will deter and delay necessary efforts to repair and upgrade public infrastructure. Pilconis Decl. ¶ 22. The Rule's vague and case-specific standards will prevent plaintiffs' members and their clients from making informed decisions about operations, finances, and logistics of a project that is potentially near a WOTUS. Riggs Decl. ¶ 8.

---

[2] Declarations of plaintiffs and their members in support of this motion for preliminary injunction are attached as **Exhibit A**.

**2.      The Rule will require plaintiffs' members to conduct costly and time-consuming jurisdictional investigations and forgo or scale back projects and activities.**

The Rule imposes concrete, significant costs on plaintiffs' members and their clients nationwide. Jurisdictional determinations and CWA permits are expensive to obtain, often costing hundreds of thousands of dollars. Briggs Decl. ¶ 51; Coyner Decl. ¶ 14; Goldstein Decl. ¶ 11; Pilconis Decl. ¶ 27; Ward Decl. ¶ 12. Obtaining jurisdictional determinations and permits means paying consultants and engineers and incurring mitigation and other compliance costs. Briggs Decl. ¶ 51. And jurisdictional determinations take months to years, during which landowners are in limbo. *Id.*; Coyner Decl. ¶ 14; Pilconis Decl. ¶ 27. Given the vagueness of the Rule, a property owner that undertakes its own analysis of WOTUS runs a real risk that the Agencies may later challenge its conclusions, exposing the landowner to additional costs and the threat of civil fines and criminal penalties. Rorick Decl. ¶ 13. As the Agencies admit, the number of jurisdictional determinations will increase under the Rule from the status quo. 88 Fed. Reg. 3047 n.65.

Plaintiffs' members will be forced to abandon or curtail use of their land rather than incur the costs of investigating whether WOTUS are present. Briggs Decl. ¶ 51. Companies that mine the aggregates essential for construction will choose not to expand their facilities or open new ones. Coyner Decl. ¶ 13. Companies will be more likely to forgo oil and natural gas development in some areas out of concern that the Agencies may deem a feature to be a WOTUS. Rorick Decl. ¶ 13. Miners of metals, coal, and industrial and agricultural minerals will need to change their operations, which could result in stranded reserves and lost production. Sweeney Decl. ¶ 10.

These harms will occur nationwide, including in North Dakota. For instance, the Rule allows the Agencies to aggregate "similarly situated" waters, including prairie potholes, across an entire watershed and to claim jurisdiction over all such features if the Agencies determine that those features collectively perform a single function on downstream waters, such as hosting

migratory birds. Missling Decl. ¶ 7. Prairie potholes are a type of depressional wetland prevalent in North Dakota. *Id.*; Pilconis Decl. ¶ 18. The Rule threatens to capture massive amounts of North Dakota land features within federal regulatory jurisdiction. Missling Decl. ¶ 7.

Another example: northern New England has many developments that involve repurposing textile and paper mills. Bennett Decl. ¶¶ 5-6. Those sites typically include impoundments and historically culverted, ditched, or buried stream channels that might now be jurisdictional under the Rule and will require costly and time-consuming jurisdictional determinations to find out whether they are in fact covered. *Id.* ¶ 6. Further, coal mines from North Dakota to Texas will be harmed because previously unregulated features on their land, such as ephemeral streams and prairie potholes, may now be jurisdictional. McGrew Decl. ¶¶ 11-12. Additionally, farmers grazing livestock on federal land will face uncertainty whether they need to change their practices because there are features on that land that may now be jurisdictional. Glover Decl. ¶ 6.

Because the Rule defines as jurisdictional countless sometimes-wet landscape features that are ubiquitous in and around farmland, many common features of farm and ranch lands will be subject to the Agencies' permitting requirements. Briggs Decl. ¶¶ 34-35. As a result, the Agencies may require permits for typical activities on those lands such as moving dirt, applying products, and plowing, planting, and building fences near ephemeral streams. *Id.* ¶¶ 42-43; Haag Decl. ¶ 6.[3]

These declarations state that features "may" now be jurisdictional because the Rule is far too vague to *know* if they are jurisdictional; plaintiffs' members will need to spend money and

---

[3] The Rule's exclusion of "ditches" applies only to ditches "excavated wholly in and draining only dry land and that do not carry a relatively permanent flow of water," 88 Fed. Reg. 3103—rendering the exclusion useless to a farmer who lacks knowledge of the conditions of the land when the ditch was excavated, faces uncertainty over whether only "dry land" is drained, and cannot guess what the Agencies mean by a "relatively permanent flow."

time to try to find out, which is an immediate and irreparable harm from the illegal new Rule. That uncertainty is an unlawful feature of an unlawful Rule, not a defect in plaintiffs' showing of harm.

## LEGAL STANDARD

In determining whether to grant a preliminary injunction, the district court considers four factors: "'(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.'" *Progressive Techs., Inc. v. Chaffin Holdings, Inc.*, 33 F.4th 481, 485 (8th Cir. 2022). "Central to this analysis 'is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" *EZ Blockchain LLC v. Blaise Energy Power, Inc.*, 589 F. Supp. 3d 1102, 1108 (D.N.D. 2022).

## ARGUMENT

Each of the four preliminary injunction factors is readily satisfied in this case.

### A.     Plaintiffs are likely to prevail on the merits of their claims.

#### 1.     The Agencies' statutory interpretation is not entitled to deference.

As the Texas district court held, the Agencies' interpretation of WOTUS is not entitled to deference. *Texas* at 17-19. The en banc Fifth Circuit explained that an agency interpretation of an ambiguous statute is not entitled to deference when the statute imposes criminal penalties. *Cargill v. Garland*, 57 F.4th 447, 467-68 (5th Cir. 2023) (en banc). That principle derives from the well-established rule of lenity, which requires that ambiguity be resolved against application of criminal penalties. *See United States v. Parker*, 762 F.3d 801, 806 (8th Cir. 2014) (discussing the "venerable" rule of lenity). Moreover, no deference is due when "the Government has construed the same statute in two, inconsistent ways at different points in time." *Cargill*, 57 F.4th at 467-69.

The CWA imposes criminal penalties, so the Agencies' interpretation of WOTUS is not entitled to deference; and the rule of lenity requires that WOTUS be construed narrowly, not expansively as the Agencies claim. Further, the Agencies have interpreted WOTUS inconsistently, most recently in the 2020 Navigable Waters Protection Rule ("NWPR"), which excluded from federal authority many water and land features that would be jurisdictional under the Rule (*see* 88 Fed. Reg. 3063-64); and before that in the 2015 Rule, 80 Fed. Reg. 37,054 (June 29, 2015)), which applied a novel test to arrive at an expansive definition of WOTUS, including specific distance criteria. The Agencies have for decades adopted a series of radically different interpretations of WOTUS, each of which has been struck down as inconsistent with the statute (*see SWANCC*; *Rapanos*; *Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019); *Pascua Yaqui Tribe v. U.S. EPA*, 557 F. Supp. 3d 949 (D. Ariz. 2021)), and their views of judicial authority to police their WOTUS interpretations have been held to be flatly wrong. *See Sackett v. EPA*, 566 U.S. 120 (2012); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016); *Nat'l Ass'n. of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018). Thus, the Agencies' approach to WOTUS has been an abject failure in every respect from the start, and they have forfeited any claim to deference.

        **2.**        **The Rule is contrary to the CWA.**

The Rule exceeds the Agencies' statutory authority. *See* 5 U.S.C. § 706(2)(C).

        **a.**        **The Rule ignores the CWA's "navigable waters" requirement.**[4]

The Texas district court correctly concluded that plaintiffs are likely to succeed on their argument that the Rule impermissibly covers all interstate waters. *Texas* at 23-26. The CWA grants the Agencies jurisdiction over "navigable waters," which the statute defines as "the waters of the

---

[4] In addition, the Rule's significant nexus test is more expansive than Justice Kennedy's test from *Rapanos* so that, even if that test set forth the limits of the Agencies' jurisdiction, the Rule is invalid. *See Texas* at 19-23.

United States." 33 U.S.C. § 1362(7). The Supreme Court made clear that "Congress' separate definitional use of the phrase 'waters of the United States' [does not] constitute[] a basis for reading the term 'navigable waters' out of the statute." *SWANCC*, 531 U.S. at 172. Although "the word 'navigable' in the statute" may have "limited import," it does not have "no effect whatever." *Id.* at 172-73 (citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985)). Instead, the phrase "navigable waters" demonstrates what "Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Id*. at 172. In his concurrence in *Rapanos*, Justice Kennedy explained that if "navigable" is to have any meaning, the CWA cannot be understood to "permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." 547 U.S. at 778; *see also id*. at 733-34 (plurality). The Rule's inclusion in WOTUS of features with only a "remote and insubstantial" connection to navigable waters exceeds the Agencies' authority and runs headlong into five Justices' views in *Rapanos*.

One example: the Rule asserts federal jurisdiction over all "interstate waters, including interstate wetlands"—"all rivers, lakes, and other waters that flow across, or form a part of, State boundaries." 88 Fed. Reg. at 3072. Therefore, a water or wetland is a WOTUS if it crosses a state line, no matter how small or isolated it might be and regardless of whether the water is navigable. As a district court held in striking down the 2015 Rule (and as the Texas court preliminarily agreed), the "Agencies' assertion of jurisdiction over all interstate waters is not a permissible construction of the CWA because they assert jurisdiction over waters that are not navigable-in-fact and otherwise have no significant nexus to any other navigable-in-fact water." *Georgia v. Wheeler*, 418 F. Supp. 3d at 1359. And as the *Wheeler* court recognized (and as remains the case,

*see* 88 Fed. Reg. 3142), a categorical exercise of jurisdiction over interstate waters also brings within federal jurisdiction the tributaries to such waters, no matter how remote they are from a traditionally navigable water. *Id*.

> **b.    The Rule reads Section 101(b)'s protection of traditional state authority over land and water use out of the statute.**

In the CWA, Congress stated a purpose to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use … of land and water resources, and to consult with the [EPA] in the exercise of [its] authority under this chapter." 33 U.S.C. § 1251(b). The Agencies acknowledge Section 101(b), but they discount it, "subordinat[ing]" it to the "overarching objective" in Section 101(a) of "restoring and maintaining the chemical, physical, and biological integrity of the nation's waters." 88 Fed. Reg. 3043-44. The Agencies' interpretation ignores the statutory text.

Sections 101(a) and 101(b) must be read together. *Minnesota ex rel. N. Pac. Ctr., Inc. v. BNSF Ry. Co.*, 686 F.3d 567, 572 (8th Cir. 2012). Section 101(a) states that "[t]he objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve that objective, Congress enumerated 7 "national goals" and "policies." *Id*. Before stating any specific powers to achieve those goals, Congress provided in Section 101(b) that it intended to preserve and protect traditional state authority over land and water use. 33 U.S.C. § 1251(b). Thus, while the Agencies state that the CWA is designed to address the pollution-control objective set forth in Section 101(a) "through a 'comprehensive' Federal program of pollution control," 88 Fed. Reg. 3044, they ignore the very next provision in which Congress placed a limit on the scope of federal powers: the "overarching objective" of Section 101(a) must be carried out in a way that "preserve[s]" and "protect[s]" the "rights of States" to "plan the development and use … of land and water resources." 33 U.S.C. § 1251(b).

This matters to the private plaintiffs. Land-use decisions are best made by local governments, which are most familiar with the features and needs of the area in which a project is located, not by federal bureaucrats taking their orders from unelected officials in Washington. The CWA preserves that local control; the Rule takes it away.

### 3. The Rule violates the Constitution.

#### a. The Rule is an improper exercise of authority under the Commerce Clause.

*SWANCC* rejected the Agencies' claim to regulate water to the widest limits of Congress's Commerce Clause power, holding that the basis of the CWA was not the broadest "affects commerce" head of the commerce power but instead Congress's authority over channels of interstate commerce. 531 U.S. at 172-73. Now, the Agencies claim to be regulating WOTUS to the full extent of Commerce Clause authority over channels of interstate commerce. 88 Fed. Reg. 3045. But the "channels" authority has limits. It must be tied to navigability; but the Rule violates—indeed makes no pretense to adhere to—that limit. *See SWANCC*, 531 U.S. at 172-74.

#### b. The Rule is unconstitutionally vague.

"A fundamental principle in our legal system" is that laws "must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012). A law "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Id*. A law is too vague if it fails to "provide adequate notice of the proscribed conduct" or "lend[s] itself to arbitrary enforcement." *United States v. Washam*, 312 F.3d 926, 929 (8th Cir. 2002). The Rule fails both tests, which are especially important constraints when criminal penalties are involved as with the CWA.

The Rule is replete with terms that define WOTUS but leave the plaintiffs' members guessing at their meaning. The Rule also gives nearly unfettered discretion to the Agencies to make

fact-intensive, case-by-case jurisdictional determinations by applying broad "factors" to determine whether a feature significantly affects a "function" of a jurisdictional water. 88 Fed. Reg. 3143. Vague terms that allow the Agencies to "know it when they see it" but deprive plaintiffs' members of fair notice are all the more constitutionally repugnant because the CWA is a criminal statute.

*First*, the Rule fails to provide fair notice of what will be considered a WOTUS because the significant nexus test in the Rule relies on hopelessly vague terms. As plaintiffs' declarants state, they and their members are left to guess whether a feature will be considered jurisdictional because of the vagueness of key terms such as "material influence," "in the region," and "similarly situated". *E.g.*, Briggs Decl. ¶ 44; Goldstein Decl. ¶ 12; Rorick Decl. ¶ 12. Whether a feature is "similarly situated" to others and "materially influences" a jurisdictional water depends on a number of indeterminate "factors" and "functions" that the Agencies, in their complete discretion, will weigh on a case-by-case basis. 88 Fed. Reg. 3067. That does not provide fair notice.

*Second*, the Rule is essentially standardless, allowing arbitrary and discriminatory enforcement by the Agencies. For instance, the Agencies will use the Rule's significant nexus standard to determine if a water is WOTUS by examining whether the water "alone, or in combination with other similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of the waters identified in paragraph (a)(1) of this rule." 88 Fed. Reg. 3119. To determine whether there is the requisite "significant effect," the Agencies will determine whether there is "a material influence on the chemical, physical, or biological integrity" of a paragraph (a)(1) water. *Id*. To determine whether there is a "material influence," "waters, including wetlands, are evaluated either alone or in combination with other similarly situated waters in the region based on the functions the evaluated waters perform." *Id.* Whether the water is performing the required functions, which include standardless concepts such as "contribution of

flow" and "transport of materials," by itself or together with "similar" features, whatever they may be, is determined by examining certain "factors." *Id.* at 3120. The factors the Agencies will consider are "site-specific conditions that influence the strength of the functions that lakes and ponds, streams, and wetlands provide to paragraph (a)(1) waters." *Id*. They include distance from a paragraph (a)(1) water, size, hydrologic factors, landscape, and climate variables. *Id*.

The vagueness of the significant nexus test did not escape the Texas district court. *Texas* at 23 n.11. It observed that "[s]ecuring a permit under the Act is an expensive and time-consuming endeavor" and the failure to do so "can result in significant fines": but "[e]ven determining whether one needs to pursue a permit has long been a tall order" and the Rule's "significant-nexus test, with its numerous factors and malleable application, seems to muddy the water even more." *Id*.

In sum, the significant nexus test—a cornerstone of the Rule—requires a rudderless case-specific examination of features to determine if they significantly affect a jurisdictional water, which means that they must materially affect the jurisdictional water, which in turn requires that the water, alone or aggregated with other vaguely defined similarly situated waters, performs broad functions, to be determined by an analysis of amorphous factors that depend on the particular site. And absent from this discussion is any indication what "score" a water must receive to be considered jurisdictional under the test. For a Rule that gives rise to substantial criminal and civil penalties that is not constitutionally permissible, but a clear violation of due process.

### 4.    The Rule violates the major questions doctrine and is the product of an improper delegation of legislative powers.

The definition of WOTUS determines federal regulatory jurisdiction over countless features in every corner of the Nation. Plaintiffs' declarants illustrate the dramatic breadth of the effects of that definition on farms, ranches, many types of industry, construction, and infrastructure. An agency, however, is not permitted to make such major policy decisions through

rulemaking. Rather, that is the job of Congress. *West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022). There, the Supreme Court explained that agencies are not permitted to exercise regulatory power "over a significant portion of the American economy" or "make a 'radical or fundamental change' to a statutory scheme" through rulemaking without clear authorization by Congress. *Id*. Instead, the Court "presume[s] that 'Congress intends to make major policy decisions itself, and not leave those decisions to agencies." *Id*. at 2609.

The Agencies claim that Congress authorized them to define WOTUS by providing an ambiguous definition of the term and generally authorizing the EPA Administrator to promulgate rules to effectuate the statute. But that vague grant of general authority to enforce the CWA is not the type of "clear congressional authorization" required to allow an executive agency to answer a major question. *See West Virginia*, 142 S. Ct. at 2614-15.

And if Congress did authorize the Agencies to answer the major question of the scope of their own jurisdiction under the CWA, that authorization is an unconstitutional delegation of legislative powers. For Congress to permissibly delegate its exclusive legislative power, it must "'lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Mistretta v. United States*, 488 U.S. 361, 372 (1989). The CWA contains no such intelligible principle. Indeed, the radical shifts among the Agencies' successive interpretations of WOTUS in the 2015 Rule, the NWPR, and the current Rule evidence the lack of intelligible principles to guide the Agencies' rulemaking. Meaningful judicial enforcement of the nondelegation doctrine is thus needed to "respect[] the people's sovereign choice to vest the legislative power in Congress alone. And it's about safeguarding a structure designed to protect [the people's] liberties, minority rights, fair notice, and the rule of

law." *Gundy v. United States*, 139 S. Ct. 2116, 2135 (2019) (Gorsuch, J., dissenting). Congress has not adequately delegated legislative power to the Agencies to define WOTUS.

>   **B.**     **Immediate enforcement of the Rule will cause severe and irreparable harm to plaintiffs, their members, and their members' clients.**

Under the Rule, plaintiffs' members and their clients face a choice: seek costly jurisdictional determinations and/or permits, risk fines and criminal charges for noncompliance, or forgo the use of land. Each choice results in irreparable harm. *First*, plaintiffs' members are irreparably harmed because the government's sovereign immunity bars them from recovering the substantial costs of complying with the Rule after that Rule is invalidated. *See Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000); *Ass'n of Equip. Mfrs. v. Burgum*, 2017 WL 8791104, at *10 (D.N.D. Dec.14, 2017), *aff'd*, 932 F.3d 727 (8th Cir. 2019); *see also Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) ("The federal government's sovereign immunity typically makes monetary losses [from compliance with subsequently invalidated laws] irreparable.").

Plaintiffs' declarations establish that the vagueness and increased breadth of the Rule requires that they either undertake costly jurisdictional determinations or else forgo development of their land. Beverly Decl. ¶ 9 (vagueness of the Rule deters property owners from undertaking projects); Briggs Decl. ¶ 50 (vagueness and arbitrariness of the Rule forces landowners to bear burden of costly jurisdictional determinations); Chetti Decl. ¶ 14 ("Uncertainties created by the Rule will cause apartment firms to expend time and resources to simply determine whether a property needs a federal permit."); Coyner Decl. ¶ 13 (vagueness of the Rule "will make opening a new operation or expanding an existing operation" more difficult and "[i]t is a virtual certainty that some of our member companies will have to alter their operations to comply with the Rule"); Gear Decl. ¶ 9 (vagueness of Rule will require businesses to expend resources to determine whether features on their land are WOTUS); Goldstein Decl. ¶ 12 ("The Rule's vagueness and

ambiguity will require both project owners and ARTBA members to expend considerable time and money to determine whether the waters or dry landscape features involved on any job site" have a sufficient nexus to a WOTUS); Lindstrom Decl. ¶ 6 (Cass County farmers "will be required to engage in costly and time consuming activities to determine the applicability of the Rule to features on their farm or ranch."); McGrew Decl. ¶ 13 (North American Coal "will incur increased permitting, administrative, and mitigation costs" "[b]ased solely" on the Rule); Missling Decl. ¶ 8 (North Dakota farmers and ranchers "will be required to expend resources or forgo or alter the use of their land as a result of the Rule"). Additionally, the declarations provide concrete examples of features that may now be jurisdictional under the Rule, such as prairie potholes near several mines in North Dakota, McGrew Decl. ¶ 10, wet depressions on farm land, Briggs Decl. ¶ 36, dry washes on the Chilton Ranch, Chilton Decl. ¶ 7, to name a few, and specific projects such as the Hillwood development that must now be reassessed under vague guidelines. Balda Decl. ¶ 7. These costs will occur as a result of the Rule; the harms are neither speculative nor insubstantial. *See* 88 Fed. Reg. 3047 n.65 (admitting jurisdictional analyses will increase under the Rule over the status quo).

*Second*, a regulation creates irreparable harm when it "places an immediate and irreversible imprint" on businesses in the form of diversion of resources. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021); *see also HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021). Plaintiffs' members will be forced to divert resources from other activities, such as maintenance of ditches and expanding current projects, in order to undertake the costly and time-consuming jurisdictional investigations required under the Rule. *E.g.*, Goldstein Decl. ¶¶ 8, 10.

*Third*, the chilling effect on a party's conduct from the "threat of 'criminal and civil penalties'" is sufficient to establish irreparable harm. *Gulfport Energy Corp. v. FERC*, 41 F.4th

667, 676 (5th Cir. 2022). As discussed, plaintiffs' members will inevitably forgo projects, developments, and land use in order to avoid the risk of serious civil and criminal penalties.

In *Texas*, the district court found (at 29) that the business plaintiffs in that case did not show irreparable harm. The court deemed their declarations "conclusory and speculative" because they state that the Rule will "likely" cause permitting delays, add development costs and create additional legal risks. *Id*. The court, however, did not address the core irreparable harm described in those declarations: the Rule is so vague (as the Texas court apparently agreed), that landowners and users cannot tell with any certainty whether the Rule will apply to features on their property. As a result, they will need to undertake jurisdictional investigations, which are "expensive and time-consuming," as the Texas district court recognized. Those costs, which are unrecoverable due to the Agencies' sovereign immunity, are an irreparable harm.

Without any analysis, the Texas court also found that the harm to plaintiffs was "self-inflicted" (presumably because they choose to undertake costly investigations to determine whether to seek jurisdictional determinations or permits). *Texas* at 29. The harm, however, arises *only* because the unlawful Rule is over-broad, vague, and indeterminate. The Texas court cited *Texas v. Biden* for the rule that self-inflicted harm does not satisfy the irreparable harm standard, but the self-inflicted harm in that case was that the movant started to unwind a program before the litigation requiring it to do so was resolved. 10 F.4th 538, 558 (5th Cir. 2021). Plaintiffs' members here have not acted prematurely as in *Texas v. Biden* or otherwise failed to preserve their interests. *See Swift Power Servs. v. N. Country Constr. & Rentals*, 2013 WL 12085489, at *4 (D.N.D. Jan. 7, 2013). And unlike in *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011)—where the court held that a party's decision to start construction before receiving a CWA permit was self-inflicted harm—plaintiffs' members are reasonably incurring costs to assess

whether they need jurisdictional determinations or permits under the unlawful Rule, because the risk of getting that wrong is criminal prosecution, civil penalties, or interest-group suits. Harms here are inflicted by the challenged Rule; no principle requires plaintiffs' members to risk going to jail to perfect a claim to irreparable harm.

### C.    The balance of harms and public interest favor an injunction.

There is little counseling against a nationwide preliminary injunction. "The Government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns.'" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). Indeed, the public interest is "perforce … served by enjoining the enforcement" of invalid laws. *Bank One v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999). Further, States have their own robust protections of wetlands that will remain in place after an injunction. *E.g.*, N.D. Cent. Code § 61-31-01 *et seq*. (waterbank program); *id*., § 61-32-03 (permitting process for drainage of wetlands).

### D.    The injunction should be nationwide in scope.

This Court should enter a nationwide injunction. Plaintiffs have members in every State, and only a nationwide injunction can spare them from harm caused by the Rule. A patchwork regulatory landscape of the sort that resulted from the challenges to the 2015 Rule, which was enjoined in half the country, would leave many of plaintiffs' members subject to an unlawful Rule that interferes with their businesses and use of their land.

Anyway, "the scope of injunctive relief is dictated by the extent of the violation established" rather than the "geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Coleman v. Block*, 100 F.R.D. 705, 706 (D.N.D. 1983) (holding that nationwide relief is appropriate to remedy "legal issues of a national scope"). This Court's judicial "power is not limited to the district wherein the court sits but extends across the country." *Texas v. United States*, 809 F.3d 134, 188, 217 (5th Cir. 2015). The Eighth Circuit recently

explained that a nationwide preliminary injunction is appropriate when "an injunction limited to the plaintiff States … would be impractical and would fail to provide complete relief to the plaintiffs." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (per curiam). Here, the Rule is national in scope, with great effect on the economy as well as federal-state relations. As plaintiffs' declarations show, the Rule affects land use from repurposing textile mills in New England to coal mines and farmers in North Dakota. National regulations should not apply differently depending on the happenstance of location.

The Texas district court discounted the need for uniform nationwide relief, in part relying on the fact that 24 States have brought the instant action. *Texas* at 33. Further, the court declined to address plaintiffs' arguments regarding why nationwide injunctive relief was necessary to protect their members. *Id.* at 34. But for the above reasons, nationwide injunctive relief is appropriate to protect the interests of the parties before this Court—including plaintiffs, who between them have millions of members located in every State—and to avoid a harmful regulatory patchwork that would result from anything less than a nationwide injunction.

Finally, under basic equitable principles, an injunction must at the very least operate "with respect to specific parties" before the Court. *California v. Texas*, 141 S. Ct. 2104, 2115 (2021). The specific parties in this case are the millions of plaintiffs' members and their members' clients, who are located in every State of the Nation. The Agencies should therefore be enjoined from implementing the Rule against any of those members and their clients.

## CONCLUSION

For the foregoing reasons, this Court should preliminarily enjoin the Rule nationwide while the merits of plaintiffs' challenge are resolved.

Dated:  March 29, 2023

Respectfully submitted,

*/s/ Katie J. Schmidt*
_____

Timothy S. Bishop (*pro hac vice*)
Brett E. Legner (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Email: tbishop@mayerbrown.com
Email: blegner@mayerbrown.com

James B. Danford, Jr. (*pro hac vice*)
MAYER BROWN LLP
700 Louisiana Street, Suite 3400
Houston, TX 77002
Tel:  713-238-2700
Email: jdanford@mayerbrown.com

Katie J. Schmidt (ND ID #06949)
Andrew D. Cook (ND ID #06278)
OHNSTAD TWICHELL, P.C.
444 Sheyenne Street, Suite 102
P.O. Box 458
West Fargo, ND 58078-0458
Tel: (701) 282-3249
Fax: (701) 282-0825
*Email: kschmidt@ohnstadlaw.com*
*Email: acook@ohnstadlaw.com*

*Counsel for Intervenor-Plaintiffs*